KELBERN M. SIMPSON AND GISELA SIMPSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3441-73.    Filed August 28, 1975.

*Ralph L. Jacobson,* for the petitioner.
*Nicholas G. Stucky* and *Thomas F. Kelly,* for the respondent.

FORRESTER, *Judge:* Respondent has determined a deficiency of $538 in petitioners' 1970 self-employment tax.[1] The sole issue for our determination is whether Kelbern Simpson is liable for the self-employment tax imposed by section 1401(a)[2] or whether he is excluded from liability for such tax because he is an "employee" within the meaning of section 1402(c)(2).

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Kelbern and Gisela Simpson are husband and wife who resided in San Anselmo, Calif., at the time the petition was filed. Petitioners' income tax return for the calendar year 1970 was filed with the Internal Revenue Service Center in Ogden, Utah.

From 1958 through 1974, petitioner Kelbern Simpson (Simpson) was an agent for Farmers Insurance Group. Farmers Insurance Group (Farmers) is a trade name identifying a group of casualty, property, and life insurance companies owned or managed by Farmers Group, Inc., a Nevada corporation with its principal office located in Los Angeles, Calif.

Farmers is organized into nine regional offices located in Merced, Los Angeles, and Santa Ana, Calif.; Portland, Oreg.; Colorado Springs, Colo.; Pocatello, Idaho; Austin, Tex.; Aurora, Ill.; and Kansas City, Kans.

---

[1] Petitioner Gisela Simpson is a party solely as a cosigner of a joint return with her husband, Kelbern Simpson. Hereinafter, we will refer to Kelbern Simpson as the petitioner in this case.

[2] Unless otherwise specified, all statutory references are to the Internal Revenue Code of 1954.

Simpson worked as a Farmers' agent in the Merced region which covers the northern portions of California and Nevada. There are over 700 full-time Farmers' agents in the Merced region, with over 2,000 agents in the State of California, and approximately 5,500 such agents in the United States. The Merced region is composed of 55 districts, and each district has a district manager.

In June 1958, Simpson, who had no prior experience in the insurance business, was hired by Robert Thomas (Thomas), a Farmers' district manager located in San Rafael, Calif. Thomas presented Simpson with a Farmers' contract, which he signed without negotiation. After signing the contract, Simpson participated in a Career Trainee Program for a period of 18 months beginning on June 11, 1958.

Together with other Farmers' agents, Simpson worked out of the San Rafael district manager's office until 1962, when the district office and agents moved to Northgate, Calif. While Simpson worked out of the San Rafael and Northgate district offices, he paid no rent or business expenses in connection with the operation of the offices.

In 1966, Simpson moved into his own office, located in San Anselmo, Calif. He shared office space with another Farmers' agent, Andrew Gillespie (Gillespie), though Farmers did not require him to do so.

In that same year, Simpson signed a new contract with Farmers. Shortly thereafter, however, Farmers developed another contract for its agents, known as the "buff contract," and afforded Simpson and other agents an opportunity either to sign and operate under the buff contract or continue to operate under the 1966 contract. As did most other Farmers' agents in 1968, Simpson chose to execute the buff contract. It is this contract under which Simpson operated during 1970, the year in issue.

During 1970, in addition to selling casualty and life insurance for Farmers, Simpson also represented and solicited insurance for 19 other insurance companies. However, the buff contract restricted Simpson so that he could not place insurance with other companies unless: (1) The policy involved an unacceptable risk as defined by Farmers' published rules and manuals; (2) the policy class or line of insurance was not written by Farmers; (3) the policy was first submitted to Farmers for approval and declined, or (4) the policy was canceled by Farmers. Thus, unless

the policy fell within the above four categories, Simpson was required to place the policy with Farmers, notwithstanding that he might obtain a higher commission from a policy placed with another company or that a policy offered by another company might be more favorable to a particular client.

Under the buff contract, Farmers reserved the right to review and examine Simpson's records for purposes of verifying compliance with the contract.

Also, Simpson was required to collect and promptly remit moneys due Farmers and to provide a fidelity bond in favor of Farmers. He remitted the premiums he collected 3 times a week directly to Farmers together with a report entitled "Agent's Remittance Advice."

In addition, the buff contract contained the following provisions:

This Agreement terminates upon the death of the Agent and may be terminated by either the Agent or the Companies [Farmers] on three (3) months written notice.

If the provisions of this Agreement are breached by either the Agent or the Companies, the Agreement may be terminated by the other party on thirty (30) days written notice. This Agreement may be terminated immediately by mutual consent or by the Companies for the following reasons:

1. Embezzlement of monies belonging to the Companies.
2. Switching insurance from the Companies to another carrier.
3. Abandonment of the Agency.
4. Conviction of a felony.
5. Wilful misrepresentation that is material to his Agency Operation.
&ast; &ast; &ast;

The Agent or his heirs may sell all or any part of this Agency to a member(s) of the Agent's immediate family at any time, provided the purchaser is acceptable to the Companies, and provided the sale price does not exceed the proportionate share of the "Contract Value" (as hereinafter defined) of the Agency.

In the event of termination of this Agreement, the Companies will normally pay "Contract Value" to the Agent or his heirs. If the Companies do not pay the "Contract Value", the Agent or his heirs may, in writing, nominate a successor(s). Such nominee(s) must be acceptable to the Companies, and be ready, willing, and able to operate the Agency within thirty (30) days of termination of this Agreement.

The Agent, or his heirs, may negotiate with such nominee(s) for the purchase of his interests under this Agreement, but the sale price shall in no event exceed the "Contract Value".

CONTRACT VALUE

Contract value is based upon (1) the amount of service commissions paid to the Agent on his active policies during either the six month or twelve month

period immediately preceding termination; (2) the number of policies in the Agent's active code number; (3) the number of years of continuous service as an Agent for the Companies immediately prior to termination.

\* \* \*

Nothing contained herein is intended or shall be construed to create the relationship of employer and employee; rather, the Agent is an independent contractor for all purposes.

The time to be expended by the Agent is solely within his discretion, and the persons to be solicited and the area wherein solicitation shall be conducted is at the election of the Agent.

The Agent shall, as an independent contractor, exercise sole right to determine the time, place and manner in which he carries out the objectives of this Agreement, provided only that he conform to normal good business practice, and to all State and Federal laws governing the conduct of the Companies and their Agents.

On certain occasions, Farmers directly contacted Simpson's clients regarding the purchase of different or expanded insurance coverage.

Under Farmers' operating procedures, when a policyholder moved out of an agent's effective service area, Farmers would reassign the policy to a district in the area where the risk was located. The policy was then assigned by the district manager to an agent within his district for servicing. The policyholder could, however, retain his original agent by making a written request to Farmers.

In 1970, all Farmers' agents had the same authority to bind customers with Farmers' preferred-rate automobile insurance company. During 1969 and 1970, numerous insurance companies, including Farmers, experienced large automobile underwriting losses. In order to decrease such losses, Farmers instituted a "Field Underwriting Program" in 1971. By the middle of 1972, the Field Underwriting Program was fully implemented, and all agents were assigned either preferred, advanced, standard (basic), or limited underwriting authority. An agent was placed in one of these four categories based generally upon his period of service as a Farmers' agent, the number of policies in force, and his retention and loss ratios.

The difference between the four underwriting categories involved the types of automobile insurance coverage to which the agent could bind Farmers without advance approval. Those agents in the preferred category could bind the most risks without Farmers' advance approval while those in the limited

category could bind the fewest. Simpson was an advanced underwriter, as were most other Farmers' agents.

In setting up his office with Gillespie, Simpson purchased, with his own funds, a variety of office assets including desks, chairs, file drawers, recorders, and typewriters. Farmers neither instructed Simpson as to the type office assets he should purchase nor reimbursed him for any portion of the cost.

During 1970, Simpson purchased miscellaneous supplies for his office and incurred certain travel and entertainment expenses. He also paid for his own insurance license renewals and for his own business cards. Farmers did not reimburse him for any of these expenses. Simpson paid for approximately one-half of his advertising expenses during 1970 and Farmers paid for the remainder.

In his office, Simpson employed one secretary and fixed all the terms and conditions of her employment, including the payment of wages from which he withheld Federal and State employment and income taxes. Simpson considered her to be his employee and not Farmers'. In addition, in the operation of his office with Gillespie, Simpson was solely responsible for and paid for his portion of the office expenses including rent, office salaries, utilities, telephone, license fees, automobile, etc.

In order to better service those clients who called him at home, Simpson maintained an office in his home during 1970, although not required to do so by Farmers.

During 1970, Simpson and Gillespie chose to maintain office hours 6 days a week from 9 a.m. to 5 p.m. Simpson took vacations of 1 to 3 days without Farmers' advance knowledge or approval. Because he shared an office with another Farmers' agent, however, Simpson's office was never closed because of his vacation periods.

As a Farmers' agent, Simpson was paid solely on a commission basis and, other than "quality rater" bonuses [3] paid on certain life insurance policies, he received no bonuses from Farmers. Simpson received no sick, vacation, holiday, or overtime pay from Farmers. In addition, he did not participate in any Farmers'

---

[3] "Quality rater" bonuses were calculated by assigning points to certain factors in a particular life insurance policy, i.e., the age and income of the insured, the method of premium payment, etc. If the points added up to a certain amount, the agent was paid a bonus on the policy. Farmers retained no discretion as to the payment of the bonus if the minimum number of points were achieved on the policy.

pension or profit-sharing plan nor did Farmers pay for his medical and hospitalization insurance.

Simpson was not limited by Farmers to any geographical area within the State of California in soliciting insurance. Farmers did not provide Simpson, or any of its other agents, with "leads" in order to aid them in selling insurance.

In training inexperienced new agents, Farmers suggested a method for selling insurance. However, Farmers never required its agents to utilize any particular method of sales presentation.

Each Farmers' agent was assigned to a district administered by a district manager. Although organized roughly along geographical lines, these districts did not have fixed geographical boundaries. During 1970, Simpson's district manager was located in San Rafael, approximately 5 miles from his office.

Each district manager was compensated by Farmers on the basis of an override, or commission, computed on the premium dollars received from sales or renewals by the agents in his district.

Most district managers published and circulated reports indicating the sales production in their districts. They obtained this and related sales information from computer printouts originating in the regional offices.

Most district managers had periodic meetings that agents in their districts could attend and at which various business and sales topics were discussed. Generally, at such meetings, the following topics were covered: introduction of new types of policies, introduction of new procedures, discussion of problem areas, and discussion of selling methods. Farmers did not reimburse its agents for automobile and other expenses incurred with attendance at the meetings, nor did the agents receive compensation for time spent at the meetings. Simpson was under no obligation to attend these meetings.

A Farmers' district manager had authority to assign for servicing certain insurance policies, known as "Series 500" policies, to agents in his district. Series 500 policies were policies that previously belonged to sales agents who had retired, resigned, or terminated, and which policies were acquired by Farmers under the provisions of the buff contract. These policies bore approximately one-half the amount of commission of a regular policy. Each agent to whom these policies were assigned had the right to convert them to a full commission policy, on

which "contract value" would be paid pursuant to the buff contract, by selling additional insurance to the insured that generated a premium of at least $25 per year.

In submitting new business applications and in requesting information concerning particular risk, underwriting, or servicing problems, Simpson dealt directly and solely with Farmers' regional office and not with his district manager. The only regular report he was obligated to file with Farmers was the Agent's Remittance Advice. He was not required to make any periodic written reports to the district manager or Farmers concerning any other matter.

Generally, Simpson's district manager would either call or visit his office 3 to 5 times per month in order to discuss various topics such as a new product, the profitability of his business, or his production.

The district managers operated under a contract with Farmers providing, inter alia, that such district managers were independent contractors. The district managers also operated under a publication entitled "District Manager's Guide." In addition, Farmers published in September 1973, a booklet entitled "Planning Guide for Newly Appointed District Managers" (Planning Guide), and this booklet was distributed to newly appointed district managers in late 1973, or early 1974.

The "District Manager's Guide" provided, in part, that in extreme cases district managers may want to establish their own rules respecting binding authority along the lines of the standard underwriting category in the Field Underwriting Program.

The Planning Guide provided, in part, that the district manager "is * * * responsible for the recruiting-training and supervision of a high producing, well educated, full-time career Agency Force."

In 1967, Simpson's district manager was Fred Temps (Temps). In the early part of that year, Temps met with Simpson and informed him that his production was too low and that, if it were not raised, he would have to replace him with several new agents.

A few days later, Simpson received a letter from Temps confirming and summarizing their earlier meeting. In this letter Temps stated, in part:

I'm concerned about these figures and your policy in-force decline. This is a direct reflection on the value of my district.

As I've said before, you need help in your office—you're doing too much office work and not enough sales effort work. Kelly, we can't continue at this pace; and if things don't improve, it will be necessary to replace you with two men on the subsidy plan. I don't feel that it should be necessary to come to this. However, in order to continue, it will be necessary for you to write a minimum of 60 count per month, and continue to do so.

It is necessary to set you on a sale oriented program and I suggest we do this immediately. If I can be of any assistance, please feel free to call on me.

Simpson took Temps' letter as a threat and, for the next several months, he raised his accounts to 60 per month, however, when his production dropped below that amount thereafter he was neither terminated nor replaced.

During the year at issue, and at all times between February 1969, and July 1972, Simpson's district manager was James Bartley (Bartley).

Bartley's primary function as a district manager was to recruit and train new agents, and he spent approximately 70 percent of his time on these matters.

While Bartley served as Simpson's district manager, Simpson never requested his permission to solicit insurance for other companies. Bartley never provided Simpson with leads. He occasionally held meetings for the agents in his district, but such agents were not required to attend. If an agent failed to attend, Bartley took no disciplinary action; rather, he contacted the agent in order to tell him what he had missed at the meeting. He did not dictate the style by which the agents in his district sold insurance.

Bartley did not tell his agents what hours to operate nor did the agents within his district advise him of their office hours. The agents had full authority to hire their own office personnel, and Bartley never participated in such hirings. The agents were free to establish their own office procedures as long as such procedures conformed with good business practices.

In August 1974, Simpson ceased operating as a Farmers' agent, and he received from Farmers $16,869.80 for the "contract value" of his agency in accordance with the provisions contained in the buff contract.

As an ultimate finding of fact, we find that, during 1970, Simpson was not Farmers' employee for purposes of the tax imposed by section 1401.

OPINION

Section 1401 imposes a self-employment tax on each individual's "self-employment income." In general, "self-employment income" is defined as the gross income, less certain allowable deductions, derived by an individual from any trade or business carried on by such individual. Sec. 1402(a) and (b).

Respondent has determined that, during 1970, petitioner was an independent contractor and, therefore, liable for self-employment tax. Petitioner contends that he operated as Farmers' "employee" and that he is not liable for self-employment tax due to the exclusion accorded "employees" by section 1402(c)(2).[4]

Petitioner has the burden of proof as to this question. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure. He has not carried that burden, and we hold for respondent.[5]

---

[4] SEC. 1402. DEFINITIONS.
(c) TRADE OR BUSINESS.—The term "trade or business", when used with reference to self-employment income or net earnings from self-employment, shall have the same meaning as when used in section 162 (relating to trade or business expenses), except that such term shall not include—
    * * *
    (2) the performance of service by an individual as an employee * * *

[5] Simpson and Farmers entered into a contract in which they agreed that Simpson would be accorded the status of an independent contractor. Simpson, in this case, is attempting to show that, notwithstanding this agreement, he was in fact Farmers' "employee." This raises the issue of whether Simpson should thereby be held to a stronger burden of proof in order to contradict the express terms of the contract into which he freely entered.

The Ninth Circuit, to which this case is appealable, generally follows what is known as the "strong-proof" doctrine. *Schulz v. Commissioner,* 294 F. 2d 52, 55 (9th Cir. 1961). This doctrine has been applied with respect to the value to be assigned to a covenant not to compete and provides that, "when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration." *Ullman v. Commissioner,* 264 F. 2d 305, 307, 308 (2d Cir. 1959).

Even though petitioner here is attempting to contradict the express terms of a contract, we are of the opinion that the "strong-proof" doctrine does not apply.

One of the cornerstones of the doctrine is that "the countervailing tax considerations upon each taxpayer should tend to limit schemes or forms which have no basis in economic fact." *Schulz v. Commissioner, supra* at 55. In the type of case with which we are concerned here, the countervailing considerations are not solely those of tax. The principal may well be equally, if not more, concerned with tort liability (respondeat superior) or the power of the agent to bind it contractually. Thus, unlike those agreements assigning a certain value to a covenant not to compete, the parties in this situation may not have equal incentives in making their determination as to the proper status they wish to create.

Also, as we point out, *infra,* one of the factors in determining the existence of a common law employer-employee relationship is the relationship the parties believe they are creating. In cases involving the existence of an agency contract (as in the instant case), the parties' belief will be derived primarily from a contractual provision similar to the one here. One of the basic principles in making an employee versus independent contractor determination is that no one factor should be controlling; rather all factors must be weighed in making the final determination.

We think that to isolate the relationship provided for in the contract and, by virtue of

In defining the term "employee" for self-employment tax purposes, section 1402(d) requires that we look to section 3121(d), which defines "employee" for purposes of the Federal Insurance Contributions Act. Section 3121(d) provides, in pertinent part, that the term "employee" means, "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." Sec. 3121(d)(2).

Under these common law rules, the status of an individual as an "employee" is not capable of exact definition. 1 Restatement of Agency 2d, sec. 220, comment (c), p. 486 (1957).

Section 31.3121(d)-1(c)(2), Employment Tax Regs., defines the common law employer-employee relationship as follows:

Generally such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. * * *

Another definition is found in section 220 of 1 Restatement of Agency 2d:

A servant [employee] is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.

The existence of a common law employer-employee relationship is not determined simply by an arbitrary application of one of these general definitions. Whether or not two parties stand in an employer-employee relationship is a factual question. *J. G. Ellison*, 55 T.C. 142, 152 (1970); *Wendell E. James*, 25 T.C. 1296, 1300 (1956); *Chester C. Hand, Sr.*, 16 T.C. 1410, 1414 (1951).

Among the relevant factors to which the courts have looked in determining the substance of the employment relationship are the following: (1) The degree of control exercised by the principal over the details of the work, (2) which party invests in the

that provision, to impose a much stronger burden of proof on petitioner would be to cause the parties' belief to weigh much more heavily on the final determination than is proper under the common law rules.

In any event, we do not feel petitioner in this case has overcome his ordinary burden of proof and, therefore, we do not feel compelled to decide the question of whether the "strong-proof" doctrine should be applicable.

facilities used in the work, (3) the opportunity of the individual for profit or loss, (4) whether or not the principal has the right to discharge the individual, (5) whether the work is part of the principal's regular business, (6) the permanency of the relationship, and (7) the relationship the parties believe they are creating. Sec. 31.3121(d)-1(c)(2), Employment Tax Regs.; *United States v. Silk,* 331 U.S. 704, 716 (1947); *J. G. Ellison, supra* at 153; *Illinois Tri-Seal Products, Inc. v. United States,* 173 Ct. Cl. 499, 353 F. 2d 216, 228 (1965); 1 Restatement of Agency 2d, *supra.*

In assessing all of the pertinent factors, no one factor is controlling; rather, the result should be governed by the entire situation and the special facts and circumstances of each case.[6] Sec. 31.3121(d)-1(c)(3), Employment Tax Regs.; *United States v. Silk, supra; Cape Shore Fish Co. v. United States,* 165 Ct. Cl. 630, 636-637, 330 F. 2d 961, 965 (1964).

Petitioner argues that numerous elements in his relationship with Farmers show a high degree of control exercised by that company over the details of his work. We agree with petitioner that, in order to show the requisite control over the details of an employee's work, the alleged employer need not "stand over the employee and direct every move that he makes." *Atlantic Coast Life Ins. Co. v. United States,* 76 F. Supp. 627, 630 (E.D.S.C. 1948). However, a reading of the entire record reveals little, if any, such control existed.

In this regard, we note that Simpson was free to solicit insurance throughout the State of California. He set his own office hours and took vacations without Farmers' prior approval. He was not required to attend meetings nor was he provided with "leads" to aid him in selling insurance. With the sole exception of the Agent's Remittance Advice, he submitted no regular written reports to Farmers or his district manager. He was free to use his own methods and style in selling insurance. In short, the record reveals that in the day-to-day conduct of his business activities, petitioner was his own man and operated free from any substantial control by Farmers.

---

[6] We note that on three separate occasions the NLRB has been called upon to determine the status of Farmers' agents as "employees" under the National Labor Relations Act. Applying the common law rules, the NLRB has, on two occasions, held such agents to be "employees." However, its most recent determination (Apr. 8, 1974) held the agents to be independent contractors. We are not, of course, bound by any one of the NLRB decisions. We read all three cases with interest and note only that our decision here comports with the NLRB's most recent finding.

We fail to see how the right to audit his books, the requirement that he post a fidelity bond, or the restrictions placed on his handling of premium moneys bear on Farmers' control over the details of his work. These restrictions illustrate nothing more than Farmers' desire to protect itself against fraudulent and illegal acts on the part of its agents.

Likewise, the provision in the buff contract restricting the amount for which Simpson could sell his agency to the "contract value" does not reflect any degree of control over the manner in which he sold insurance. In fact, we concur with respondent who argues that "the concept of an agent acquiring a quasi-property right for which a principal will pay money at the termination of the relationship is inconsistent with an employer-employee relationship."

In attempting to show the significant degree of control exercised by a Farmers' district manager over his agents, petitioner relies heavily on the incident in 1967 with Temps and the statement in the Planning Guide that district managers are responsible for the "supervision" of their agents.[7]

With regard to the Temps incident, no evidence was presented to show that Temps had the authority to consummate his threat and replace Simpson with new agents. Simpson himself was never discharged and no evidence was presented to show that any Farmers' agent was ever terminated for low production. Had petitioner presented a series of incidents with his district manager showing a pattern of supervision and control similar to that illustrated by the Temps incident, we would be more persuaded by his argument. However, from this one isolated instance we are unable to conclude that such a pattern existed.

We are more persuaded by the testimony of Bartley, petitioner's district manager during 1970. He stated that he spent

---

[7] Contrary to respondent's objection, we find both of these matters relevant to Simpson's status during 1970, notwithstanding that one occurred 3 years prior and the other 3 years subsequent to the year at issue.

In addition to the actual control exercised over Simpson, we must also be concerned with Farmers' right to control. Sec. 31.3121(d)-1(c)(2), Employment Tax Regs.

The Planning Guide was published in 1973, at a time when Simpson and Farmers were operating under the buff contract. It is relevant, therefore, to Farmers' right to control Simpson during 1970 under that contract. The incident with Temps occurred 1 year prior to the execution of the buff contract. However, for purposes of our determination here, we accept petitioner's contention that the relationship between the district manager and his agents under the 1966 contract was not affected by the execution of the buff contract in 1968. Thus, we feel both matters bear on the issue at hand. See *J. G. Ellison*, 55 T.C. 142, 154, 155 (1970).

approximately 70 percent of his time recruiting and training new agents. He never provided Simpson with leads or dictated the methods by which he sold insurance. He did not instruct Simpson as to the hiring of personnel, or the establishment of office hours or procedures.

Thus, from an examination of the entire record relating to the working relationship between the district managers and their agents, it appears that the use of the word "supervision" in the Planning Guide reflects, at best, a careless and imprecise usage of the English language.

Further, we cannot accept petitioner's contention that the Field Underwriting Program and the restriction on his ability to place insurance with other insurance companies served to control the means and details by which he conducted his business activities.

Under the Field Underwriting Program, Farmers conferred upon its agents varying authority to find automobile insurance coverage without prior approval. It is a generally recognized principle of agency law that a principal may provide for the authority he desires his agent or agents to possess. 1 Restatement of Agency 2d, sec. 26 (1957). We do not think that the slight expansion or diminution of the agents' authority under this program reflects a significant degree of control over the manner in which such agents performed their duties.

The restriction on Simpson's ability to sell insurance for other companies admittedly restricted his freedom to pick and choose, from competing insurance policies, those policies that best suited the interests of his clients. This restriction did not, however, serve to control petitioner with regard to the means or details by which he sold Farmers' insurance policies. Also, we note that, in at least two other cases dealing with insurance agents, similar restrictions placed on the agents did not prevent the finding that such agents were independent contractors. See *Reserve Nat. Insurance Co. v. United States,* an unreported case (W.D. Okla. 1974, 34 AFTR 2d 74-5104, 1974-1 USTC par. 9486); *Standard Life & Accident Ins. Co. v. United States,* an unreported case (W.D. Okla. 1975, 35 AFTR 2d 75-1150, 1975-1 USTC par. 9352).

Although the degree of control exercised by Farmers over the details of Simpson's work is important, it is by no means the only

relevant factor we must consider in making our determination.[8]

First, it is clear that Simpson and not Farmers, was the party responsible for investing in the facilities utilized in the sale of insurance. He maintained his own office for which he purchased the needed equipment and supplies without reimbursement from Farmers. He maintained a separate office in his home although not required to do so by Farmers. He employed his own secretary and fixed all the terms and conditions of her employment. Other than paying for approximately one-half of Simpson's advertising expenses during 1970, no evidence was presented to show any investment in the facilities by Farmers.

Further, with the sole exception of the "quality rater" bonuses, Simpson's compensation was in the form of commissions. Thus, his opportunity for, and the degree to which he might make, a profit or loss in any given year was solely dependent upon his own efforts and skill as an insurance salesman.

Unless Simpson breached the contract, engaged in certain fraudulent, illegal, or unethical activities, or gave his consent, Farmers could only discharge Simpson by giving him 3 months' written notice. Such a right to discharge does not reflect the normal rights accorded an employer. See *J. G. Ellison,* 55 T.C. at 155.

Finally, although we realize that the contract's designation of Simpson as an independent contractor does not thereby create such a status,[9] such a description is evidence that this is the relationship the parties felt they were creating.

In support of his position, petitioner has cited a number of cases, all of which are distinguishable from the instant case.

Petitioner's reliance on *NLRB v. United Insurance Co.,* 390 U.S. 254 (1968), is misplaced. In *United Insurance Co.* the Supreme Court did not hold, as petitioner claims, that the agents were employees. Rather, the Court simply held that the Court of

---

[8] Our somewhat extended discussion of the alleged control by Farmers over the details of Simpson's work is a function of the emphasis placed by petitioner on this element and not of its relative importance vis-a-vis other relevant factors. We recognize that an employer-employee relationship may exist where the employer has little, if any, control over the details of the employee's work. See 1 Restatement of Agency 2d, sec. 220, comment (d), p. 487 (1957).

[9] Sec. 31.3121(d)-1(a)(3), Employment Tax Regs., provides:

If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if such relationship exists, it is of no consequence that the employee is designated as a partner, coadventurer, agent, independent contractor, or the like.

Appeals for the Seventh Circuit had not accorded proper weight to an NLRB determination holding the agents to be employees and should not have set aside the Board's decision merely because it would have decided the case another way. *NLRB v. United Insurance Co., supra* at 260.

Likewise, we are not persuaded by the other cases petitioner has cited to us involving determinations that certain insurance agents were employees.[10] Our reading of these cases indicates that the decisions were strongly influenced by the high degree of control exercised by the companies or their district managers over the agents' work. A comparable degree of control is absent from the instant case.

We recognize that certain indicia of an employer-employee relationship do exist in the present case. The parties intended their relationship to be a permanent one, and Simpson's work was clearly part of Farmers' regular business. However, from an examination of the entire record and after weighing all of the relevant factors, we must conclude that, during 1970, Simpson was not Farmers' employee for purposes of exclusion from self-employment tax.

*Decision will be entered for the respondent.*

---

[10] *Atlantic Coast Life Ins. Co. v. United States,* 76 F. Supp. 627 (E.D.S.C. 1948); *J. G. Ellison,* 55 T.C. 142 (1970); *Golden State Agency, Inc., and Insurance and Allied Workers Organizing Committee (CIO),* 101 NLRB 1775 (1952).