T.C. Memo. 1998-270


UNITED STATES TAX COURT


WESLEY C. AND RHONDA A. WICKUM, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7265-95.                    Filed July 27, 1998.


<u>Mark L. Rosenbloom</u>, for petitioners.

<u>Patricia Pierce Davis</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


GALE, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes, an addition to tax, and
accuracy-related penalties as follows:

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Accuracy-Related Penalty Sec. 6662(a) |
|------|-----------|------------------------------|--------------------------------|
| 1990 | $7,664 | $654 | $1,533 |
| 1992 | 10,807 | --- | 2,161 |
| 1993 | 10,069 | --- | 2,014 |

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The deficiencies and the accuracy-related penalties result from respondent's determination that Wesley Wickum (petitioner) was a common-law employee rather than an employee as defined in section 3121(d)(3)(B),[1] as petitioners claimed in their returns. Respondent recomputed petitioners' income taxes by subjecting petitioner's business expense deductions to the 2-percent floor under section 67 and by recomputing petitioners' alternative minimum tax pursuant to sections 55(a) and 56(b)(1)(A)(i).

After concessions, we must decide the following issues:

(1) Whether petitioner was a statutory employee.  We hold that he was not.

(2) Whether petitioner was an employee or an independent contractor under the common-law standards.  We hold that he was an independent contractor.[2]

_____

[1] We will refer to a person who qualifies under sec. 3121(d)(3)(B) as a "statutory employee".

[2] Respondent also argues that if we find that petitioner was
(continued...)

(3) Whether petitioners are liable for the addition to tax and accuracy-related penalties as determined by respondent. We find that they are not liable for the accuracy-related penalties but are liable for the addition to tax to the extent discussed below.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts, first supplemental stipulation of facts, and attached exhibits. At the time of filing the petition, petitioners resided in Minot, North Dakota.

During the years in issue, petitioner was a district manager for Combined Insurance Co. of America (Combined). Petitioner's primary duties as district manager were to recruit, hire, train, and supervise insurance agents who sold accident and health insurance in North Dakota. In addition, petitioner himself sold accident and health insurance for Combined in North Dakota. He was compensated by Combined in three ways: (1) Override commissions, based on sales and renewals of policies made by the insurance agents he supervised; (2) bonuses; and (3) sales

---

[2](...continued)
an independent contractor, then petitioners are liable for self-employment tax, and petitioners must include in income contributions to pension and profit-sharing plans, insurance premiums, and health care costs. As will be discussed below, we need not decide these issues because we find that petitioners have conceded them.

commissions, based on sales and renewals of policies he made. In general, during the times relevant to this case, approximately 70 percent of a district manager's income came from override commissions and bonuses; the remainder came from sales commissions. District managers were paid on commission as a carryover from the days when Combined treated them as independent contractors.

Petitioner recruited insurance agents using several different methods, including advertisements, college visits, field recruiting, and employment agencies. Normally between 15 and 25 people would interview for a single position. Petitioner set his own hiring schedule. Combined's district managers in general, and petitioner in particular, made the choice of who to hire. Combined established certain qualifications for its insurance agents, but petitioner used more stringent qualifications in selecting the insurance agents that worked under him. Following an interview, a prospective insurance agent would go on a field demonstration, a 1-day opportunity to experience the job first-hand with another insurance agent. After the field demonstration, if the district manager considered the prospective insurance agent to be promising, the district manager would normally make the decision to hire the agent, and Combined and the agent would execute a contract with respect to the agent's services. Combined never rejected an applicant that petitioner chose.

All of Combined's insurance agents were required first to attend a 2-week sales school and then undergo field training that lasted 7 weeks. The course of instruction at the sales school was uniform nationwide, whereas the field training was designed to educate the trainee regarding conditions and practices in his local sales territory. The sales school cost between $1,000 and $1,500 per agent, of which petitioner, as district manager, paid $150, and Combined paid the remainder. Field training was usually conducted by a sales manager, although sometimes by a district manager. Petitioner, as district manager, usually conducted the first week of field training himself. The 7-week field training period was not devoted exclusively to training, but rather consisted of a schedule, devised by Combined, of items to be covered in each week of the 7-week period. The manager conducting the field training was supposed to follow the program schedule for field training, but managers often did not, and Combined's senior management was aware of this fact.

The agents learned an organized sales presentation during sales school. When selling Combined's insurance products, they were required to use the organized sales presentation, which included an initial sales pitch as well as responses to possible questions from customers. The agents were taught the same presentation for a given product, regardless of where it was to be sold. The presentation was designed to function as a script for the agents, whose responsibility was to deliver it. The

words of the script were prescribed by Combined, but the agent's "style"--i.e., the manner in which he made the delivery, his overall demeanor, manner of dress, etc.--were left to the discretion of the individual agent. The main purpose for using the scripted presentation was to avoid misrepresentations of the insurance products, and agents have been fired for misrepresenting products. Nonetheless, Combined's agents did not always use the scripted presentation, and Combined's senior management was aware of this fact. Petitioner, at times, devised his own presentations, rather than those scripted by Combined, for use by the agents he supervised as well as in his own sales work. Petitioner set his own hours and those of the agents he supervised. For the sales agents he supervised, petitioner decided which of Combined's products to concentrate in, which mix of new policies versus renewals to pursue, and the location in the territory where each agent would do sales work, although the territory itself was established by Combined.

Each of the insurance products that petitioner supervised the sale of or sold had a fixed percentage commission, which was set when the product was designed for all the agents selling it in a particular State. The insurance agents' sales commissions were paid by Combined rather than by petitioner as district manager. However, by controlling the routes and accounts assigned to each agent, petitioner could significantly affect the compensation of the agents he supervised.

Petitioner was advised by Combined that he had full responsibility for his district; he filed no daily logs and got no assistance from his supervisors.  He made weekly calls reporting his sales results.  Combined did not provide specific sales goals; rather, petitioner met once a year with a regional supervisor and presented his own sales goals, and the regional supervisor would give some thoughts on achieving those goals. Petitioner held weekly meetings with his insurance agents to boost morale and to ensure that the agents had sufficient supplies.

In connection with his work, petitioner incurred substantial business expenses, the majority of which were not reimbursed. Petitioner paid 100 percent of the following expenses:  Mileage, meals when traveling, home office space, telephone service, fax machine, copier, secretary, utilities, the cost of hotel facilities in which to conduct training sessions for agents, and entertainment and incentive awards for the agents he supervised. He paid 50 percent of, and received 50-percent reimbursement from Combined for, two expenses:  (1) Advertisements he placed to fill positions of insurance agents to work under him and (2) lodging expenses while working for Combined.  Combined required that certain advertisements be used.  Combined did not require petitioner to purchase or lease equipment or office space, to hire clerical help, or to pay for incentive awards, although this last item was strongly encouraged by senior management.

Nonetheless, in order to perform the duties of a district manager effectively, it was necessary for petitioner to incur these expenses. Petitioner required the assistance of a part-time secretary to keep up with the paperwork entailed in tracking and reporting the sales of the agents he supervised. Likewise, he needed to maintain communications with his agents through telephoning, faxing, and traveling extensively. He required a place to store materials because policy forms and the like for all his agents were delivered to him quarterly. Petitioner believed that the incentive awards and entertainment that he provided for his agents at his own expense contributed significantly to the morale necessary to maintain a high level of sales in his district. During certain months, petitioner showed a loss from his activities as a district manager; i.e., his expenses exceeded his income. However, petitioner ended every year with a profit.

Petitioner executed a "Standard Employment Contract" (Contract) with Combined. The Contract required petitioner to devote all of his working time to advancing Combined's business interests. Further, the Contract prevented petitioner from representing any other insurance company. The Contract also required petitioner to abide by the rules and regulations issued by Combined with respect to the conduct of, and selling methods to be used by, Combined's field personnel and to abide by the directions of Combined's authorized personnel. The Contract

referred to the district manager as an employee. The Contract limited petitioner's territory to six named counties in the State of North Dakota. The contract that petitioner had previously signed when he was a sales representative (before becoming district manager) contained virtually identical language with respect to the obligation to abide by rules, regulations, and directions of Combined.

Under its terms, the district manager could terminate the Contract upon 2 weeks' notice. Combined could likewise terminate the Contract upon 2 weeks' notice, or without notice if the termination was for cause. "Cause" included, among other reasons, failure to observe and practice Combined's underwriting principles, financial irregularity, sale of new policies when renewals should have been sold, failure to settle accounts, and commission of a felony.

Before 1975, insurance agents who sold Combined's insurance policies were treated as independent contractors. Combined wanted to change the status of the agents from independent contractor to employee, and to that end Combined altered the contract it used. The new contract was designed to demonstrate that Combined had sufficient right of control over the insurance agents' actions so that there would be no doubt that the agents were employees. Combined made this change in part because of concern with respect to various governmental agencies, including the Internal Revenue Service, about liabilities for

mischaracterizing workers as independent contractors rather than employees.

Combined's insurance operations were organized into three divisions: Life, which exclusively sold life insurance policies; Health, which exclusively sold health insurance policies; and Accident, which sold accident and some health insurance policies. Petitioner worked in the Accident division. The policies that petitioner and the agents under his supervision sold provided cash benefits in the event of the insured's death or serious injury from specified accidents. The premiums on these policies were fixed; they did not vary with the insured's age or health status. The policies were renewable semiannually at the fixed premium.

Petitioner was licensed solely to sell accident and health insurance in the State of North Dakota. He did not have a license to sell life insurance and was not required by the State of North Dakota to carry a life insurance license in order to sell the products he sold for Combined. Combined was required to file separate reports with the North Dakota Commissioner of Insurance concerning its sales of life insurance and its sales of accident and health insurance.

Petitioner first claimed statutory employee status in an amended return for tax year 1990. On the original return for 1990, he took business expense deductions on Schedule A, but he took them on Schedule C on the amended return. When he filed as

a statutory employee, he was aware that the "statutory employee" box on his Form W-2 was not checked. Petitioner consulted with a tax attorney and discussed the nature of his work and the policies he sold. Following the consultation, the attorney advised petitioner to file as a statutory employee. On his original return for 1990, he listed his occupation as "Insurance Sales". He listed his business in the same way on his amended return. On his returns for 1992 and 1993, he listed his business as "Life Insurance Sales". Combined withheld tax for all the years in issue.

## OPINION

### Statutory Employee

Petitioners argue that petitioner was an employee under section 3121(d)(3)(B), i.e., a statutory employee, while respondent argues that petitioner does not qualify as a statutory employee. Section 3121(d) provides:

> For purposes of this chapter, the term "employee"
> means--
>
> (1) any officer of a corporation; or
>
> (2) any individual who, under the usual common law
> rules applicable in determining the employer-employee
> relationship, has the status of an employee; or
>
> (3) any individual (other than an individual who
> is an employee under paragraph (1) or (2)) who performs
> services for remuneration for any person--
>
>      *     *     *     *     *     *     *
>
>      (B) as a full-time life insurance salesman;
> * * *

Petitioner was not an officer of a corporation; moreover, as discussed later in this opinion, we find that petitioner was not an employee under the usual common-law rules. Thus, we must consider whether he was a full-time life insurance salesman.

Respondent argues that petitioner was not a full-time life insurance salesman because he did not sell life insurance, whereas petitioners contend that petitioner did sell life insurance because the policies he sold paid benefits in the event of the death of the insured.

The regulations provide as follows:

> An individual whose entire or principal business activity is devoted to the solicitation of life insurance or annuity contracts, or both, primarily for one life insurance company is a full-time life insurance salesman. * * * An individual who is engaged in the general insurance business under a contract or contracts of service which do not contemplate that the individual's principal business activity will be the solicitation of life insurance or annuity contracts, or both, for one company, or any individual who devotes only part time to the solicitation of life insurance contracts, including annuity contracts, and is principally engaged in other endeavors, is not a full-time life insurance salesman. [Sec. 31.3121(d)-1(d)(3)(ii), Employment Tax Regs.[3]]

Neither section 3121(d)(3)(B) nor the regulation just quoted defines "life insurance" or "life insurance contract". However, section 7702(a) provides that for purposes of the Internal

---

[3] This regulation mirrors the legislative history of sec. 3121(d), which contains almost identical language. See S. Rept. 1669, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 302, 347.

Revenue Code, the term "life insurance contract" means any contract that is a life insurance contract "under the applicable law".[4]  Since this definition by its terms applies for all Code purposes, we conclude that a "full-time life insurance salesman" as that term is used in section 3121(d)(3)(B) is a person engaged in the sale of "life insurance contracts" as defined in section 7702(a).  The question then becomes whether the products that petitioner sold were life insurance contracts under section 7702(a).

The parties dispute what meaning should be given to the phrase "under the applicable law" as used in section 7702(a). Respondent argues that "applicable law" means State law, in this case the law of North Dakota.  Petitioners do not directly offer an interpretation of "applicable law".  Rather, they argue that the Court should have the discretion to decide what counts as life insurance, keeping in mind the broadly remedial purpose of section 3121(d)(3)(B).  Petitioners further argue that a particular State should not have the power to affect the definition of life insurance for purposes of Federal tax law. Petitioners' concerns notwithstanding, we believe Congress intended to incorporate State law for the definition of "life insurance contract" for purposes of the Code, as evidenced by the

---

[4] There are two alternative prerequisites in sec. 7702(a) for qualifying as a life insurance contract that are not relevant to the instant case.

legislative history of section 7702(a). The conference report for the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, states with respect to the statutory definition in section 7702(a) that "A life insurance contract is defined as any contract, which is a life insurance contract under the applicable <u>State or foreign</u> law" (as long as the contract also meets one of two conditions not relevant here). H. Conf. Rept. 98-861, at 1075 (1984), 1984-3 C.B. (Vol. 2) 1, 329 (emphasis added). This interpretation is further supported by legislative history of the Technical and Miscellaneous Revenue Act of 1988 (TAMRA), Pub. L. 100-647, 102 Stat. 3342. TAMRA sec. 6078, 102 Stat. 3709, added section 7702(j), which treats certain church self-funded death benefit plans as "life insurance contracts" by exempting them from the section 7702(a) requirement that they be life insurance contracts "under the applicable law".[5] The legislative history

---

[5] Sec. 7702(j) provides as follows:

SEC. 7702(j). Certain Church Self Funded Death Benefit Plans Treated as Life Insurance.--

     (1) In general.--In determining whether any plan or arrangement described in paragraph (2) is a life insurance contract, the requirement of subsection (a) that the contract be a life insurance contract under applicable law shall not apply.

     (2) Description.--For purposes of this subsection, a plan or arrangement is described in this paragraph if--

          (A) such plan or arrangement provides for the payment of benefits by reason of the death of the

(continued...)

of TAMRA makes clear that Congress' purpose in exempting such church plans from the "applicable law" requirement was to ensure that they were treated as life insurance contracts "even if the arrangements do not constitute life insurance under applicable State law."  H. Conf. Rept. 100-1104 (Vol. II), at 169 (1988), 1988-3 C.B. 473, 659.

Since petitioner's insurance activities took place in North Dakota, the applicable law for determining whether the products he sold were life insurance contracts is the law of North Dakota.  Petitioners argue that what petitioner sold was life insurance because every policy he sold or supervised the sale of contained a death benefit if death occurred as a result of an accident covered by the policy.  In sum, petitioners' argument is that accident policies that contain death benefits constitute life

---

[5](...continued)
        individuals covered under such plan or
        arrangement, and

            (B) such plan or arrangement is provided by a
        church for the benefit of its employees and their
        beneficiaries, directly or through an organization
        described in section 414(e)(3)(A) or an
        organization described in section
        414(e)(3)(B)(ii).

        (3) Definitions.--For purposes of this subsection
    --

            (A) Church.--The term "church" means a church
        or a convention or association of churches.

            (B) Employee.--The term "employee" includes
        an employee described in section 414(e)(3)(B).

insurance.

North Dakota law distinguishes between life insurance, on the one hand, and accident and health insurance, on the other. Title 26.1 of the North Dakota Century Code is styled "Insurance", and within this title are separate chapters entitled "Life Insurance" (chapter 26.1-33) and "Accident and Health Insurance" (chapter 26.1-36). Insurance companies selling both types of insurance are required to report separately on their activities to the North Dakota Commissioner of Insurance. Although chapter 26.1-33 does not provide a definition of life insurance, the chapter does mandate certain mortality tables and interest rate assumptions for life insurance sold in the State, see N.D. Cent. Code secs. 26.1-33-22 and 26.1-33-23 (1995), which are not required with respect to accident and health insurance. Most significantly, with respect to petitioners' argument that a death benefit transforms an accident policy into a life insurance policy, chapter 26.1-36 provides a definition of accident and health insurance that encompasses the provision of death benefits, as follows: "'Accident and health insurance policy' includes any contract policy insuring against loss resulting from sickness or bodily injury, or death by accident, or both." N.D. Cent. Code sec. 26.1-36-02 (1995) (emphasis added). Thus, North Dakota law contemplates that accident policies may contain death benefits. This feature does not result in their classification as life insurance policies. We conclude that petitioner sold

accident or health insurance, not life insurance, under North Dakota law. Accordingly, petitioner was not a full-time life insurance salesman within the meaning of section 3121(d)(3)(B) and is not entitled to statutory employee status.

Common-Law Employee or Independent Contractor

Petitioners next argue that petitioner was an independent contractor under the common-law standards, while respondent argues that petitioner was an employee. We agree with petitioners. In order to decide whether an individual is an employee or an independent contractor, we consider the entire situation and the special facts and circumstances of each case. Simpson v. Commissioner, 64 T.C. 974, 985 (1975). No one factor is controlling. Id. Nonetheless, the factor on which we focus (as do the parties) is control. We consider control actually asserted over the details of an alleged employee's performance and also the degree to which an alleged employer may intervene to impose such control. Butts v. Commissioner, T.C. Memo. 1993-478, affd. per curiam 49 F.3d 713 (11th Cir. 1995); see Radio City Music Hall Corp. v. United States, 135 F.2d 715, 717 (2d Cir. 1943); deTorres v. Commissioner, T.C. Memo. 1993-161.

Respondent presents many factors that, according to respondent, demonstrate control by Combined over petitioner. We have encountered almost all of these factors in Butts v. Commissioner, supra, and its progeny, Smithwick v. Commissioner, T.C. Memo. 1993-582, affd. per curiam sub nom. Butts v.

Commissioner, 49 F.3d 713 (11th Cir. 1995); Mosteirin v. Commissioner, T.C. Memo. 1995-367; Lozon v. Commissioner, T.C. Memo. 1997-250; and also in Feivor v. Commissioner, T.C. Memo. 1995-107. In the Butts line of cases, the taxpayers were insurance agents, so-called neighborhood office agents, for Allstate. In Feivor, the taxpayer was a district manager for an insurance company. We held that the taxpayer in each case was an independent contractor. We reach the same result in the instant case, and for the same reasons: the circumstances, as a whole, do not demonstrate a sufficient amount of control by Combined to find that petitioner was an employee of the company. In particular, Combined did not exert control over the manner and means in which petitioner carried out his responsibilities. See Hathaway v. Commissioner, T.C. Memo. 1996-389.

Petitioner was a district manager; although he sold some insurance, he was primarily engaged in the duties of a district manager. We have found that district managers, on average, earned only about 30 percent of their income from commissions on sales, and we believe that at least 70 percent of petitioner's duties involved recruiting, hiring, training, and supervising of insurance agents.

Petitioner had extensive control over the manner and means of the performance of his responsibilities as district manager. He had very little supervision. He reported only weekly to his superiors and almost never received feedback from them on the

particular performance of his job.  He relied on his own methods for recruiting, the only control being over the language of the advertisements that he placed.  He decided who would be hired and, in fact, used stricter qualifications to select insurance agents than Combined itself required.  He trained insurance agents in his own way, following only the broad outlines of the training course.

Moreover, he was responsible for most of his own business expenses.  He paid for half the advertising and travel costs and all of his remaining expenses, including a secretary, office equipment, and supplies.  There was a risk he could lose money. He, in fact, did have net losses for some of the months in which he worked.  Respondent argues that he never had a loss at the end of any year; the fact that he was successful does not mean he was an employee rather than an independent contractor.  Since he was primarily compensated by means of override commissions on his agents' sales, his remuneration depended upon his skill at managing this sales force effectively and efficiently.  Because Combined ceded to petitioner the ability to substantially affect his agents' compensation (by giving them routes offering greater or lesser remunerative opportunities), petitioner, not Combined, had substantial effective control over the agents within his supervision.

Petitioner also sold insurance to a limited extent. Respondent makes much of the scripted sales talk that petitioner

was required to use when selling insurance, and it is true that one of several factors we relied on in Butts v. Commissioner, supra, was the lack of a "'canned' sales method". However, there is no evidence that Combined ever fired insurance agents merely for straying from the scripted sales talk; indeed, there is evidence that Combined's senior management acquiesced in departures from the scripted presentation so long as products were not misrepresented. In any event, petitioner's supervisory activities constituted a much larger proportion of his work than sales.

Petitioner was required by the language of the Contract to abide by rules and regulations of Combined and by directions of Combined's authorized personnel. However, in Feivor v. Commissioner, supra, we found the taxpayer to be an independent contractor notwithstanding the fact that he entered into an agreement that obligated him to abide by company regulations and provisions contained in the district manager's manual and to recruit, train, supervise, and motivate agents subject to the direction of the company. Moreover, in the instant case the record reveals that petitioner routinely devised his own manner and means of reaching results without regard to Combined's written guidelines, and Combined's senior management acquiesced in such departures.

The only significant difference between the instant case, on the one hand, and the Butts line of cases and Feivor, on the

other, is that in the latter cases the company in question required the taxpayer to maintain an office, while there was no such requirement in the instant case. However, we believe that as a practical matter petitioner was required to maintain an office in order to maintain communications with his agents and for storage of materials. Likewise, he required the services of a secretary to keep up with the paperwork entailed in supervising his agents and submitting results of their sales to Combined. This sort of investment evidences independent contractor status.

Considering the entire record in this case, we find that petitioner was an independent contractor rather than an employee.[6]

## Benefits and Self-Employment Tax

In an amendment to his answer, respondent asserted that, in the event we find that petitioner was an independent contractor, petitioners are liable for self-employment tax. Petitioners do not address the question of self-employment tax on brief, and we find that petitioners are liable for self-employment tax.[7] See sec. 1402. However, petitioners may, to the extent permitted by

---

[6] Because we have found that petitioner was an independent contractor, it is unnecessary for us to consider petitioners' argument that petitioner could not be an employee because the Fair Labor Standards Act requires employees to be paid the minimum wage, and it was possible that petitioner would receive substantially less than the minimum wage.

[7] Of course, had petitioners' statutory employee claim prevailed, petitioners would not be required to pay self-employment tax. Sec. 3121(d)(3)(B).

section 6521, offset self-employment taxes with taxes paid erroneously under section 3101.  Lozon v. Commissioner, T.C. Memo. 1997-250.

Further, respondent asserted in his amendment to answer, and argues on brief, that in the event we find that petitioner was an independent contractor, petitioners must include in income contributions by Combined and pretax contributions by petitioner into pension and profit-sharing plans and also insurance premiums and health care costs paid by Combined.[8]  Petitioners offer no argument on this point and instead concede on brief that they must include in income contributions to pension and profit-sharing plans and payments by Combined of insurance premiums and health care costs:

> The Respondent correctly observes that if Wickum is found to be an independent contractor then there will have to be a recalculation for the relevant years, in order to include in his gross income some benefits which, if he is found to be a statutory employee, would not be taxed.  The amounts of the benefits involved are the subject of a supplemental stipulation between the parties hereto, and are not disputed. * * *

Thus, we need not, and do not, address the question of whether the reclassification of a taxpayer as an independent contractor requires the inclusion in income of contributions to employee

---

[8] Respondent concedes that, had petitioners' statutory employee claim prevailed, petitioners would not be required to include the contributions to pension and profit-sharing plans in income.

benefit plans or of payments of insurance premiums and health care costs.[9]

Accuracy-Related Penalties and Addition to Tax

Respondent determined that petitioners were liable for accuracy-related penalties under section 6662(a) for the years in issue. Petitioners argue that they are not liable for accuracy-related penalties because they reasonably relied on their attorney in choosing statutory employee status on their returns. Reliance on a professional may relieve a taxpayer from the accuracy-related penalty where the reliance is reasonable. ASAT, Inc. v. Commissioner, 108 T.C. 147 (1997). On the basis of the entire record in this case, we find that petitioners' reliance on the tax attorney was reasonable. Accordingly, petitioners are not liable for the accuracy-related penalties for the years in issue pursuant to section 6662(a).

Respondent also determined that petitioners were liable for an addition to tax for the year 1990 for failure to file under section 6651. Petitioners offered no evidence explaining their failure to timely file their 1990 return. Thus, petitioners are liable for the addition to tax for the year 1990 under section 6651(a)(1) in an amount to be computed under Rule 155.

---

[9] In Lozon v. Commissioner, T.C. Memo. 1997-250, the same question arose with respect to contributions to pension and profit-sharing plans. In that case, we found that the Commissioner had conceded that the plans in question were qualified and that, under sec. 83(e)(2), the taxpayers were not required to include the contributions in income.

To reflect the foregoing,

Decision will be entered

under Rule 155.
