ROCHESTER DEVELOPMENT CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rochester Development Corp. v. Commissioner
Docket No. 9070-74.
United States Tax Court
T.C. Memo 1977-307; 1977 Tax Ct. Memo LEXIS 135; 36 T.C.M. (CCH) 1213; T.C.M. (RIA) 770307; September 12, 1977, Filed J. Ernest Brophy and Joseph A. Platania, for the petitioner. Bernard R. Baker, III, and William J. Neild, for respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined deficiencies in petitioner's Federal income tax as follows: Year
Deficiency
1967
$1,903.32
1968
125,103.66
1969
418,868.72
*136 Some of the issues have been disposed of by agreement of the parties, leaving as the sole issue for decision whether payments received by petitioner with respect to improvements made to the interiors of buildings owned by petitioner constitute rents or proceeds from the sale of such improvements. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner, Rochester Development Corporation ("Development"), is a New York corporation with its principal place of business in East Rochester, New York, at the time of the filing of the petition herein. It filed its Federal corporate income tax returns for the taxable years in question as follows: Year
Type of return
Place of filing
1967
Original
District director,
Buffalo, New York
1967
Amended
District director,
Buffalo, New York
1968
Original
District director,
Buffalo, New York
1968
Amended
Service Center,
Andover, Massachu-
setts
1969
Original
Service Center,
Andover, Massachu-
setts
Ernest J. Del Monte ("Del Monte") *137 is the sole shareholder and president of Development. He is also the controlling shareholder in Equitable Leasing Corporation ("Leasing") and the E. J. Del Monte Corporation. The Board of Cooperative Educational Services, Supervisory District # 1, of Monroe County, New York ("BOCES"), is an extension of ten school districts in Monroe County. It provides vocational training for high-school age students, special classes for handicapped pupils, and counseling services relating to mental health, speech and hearing thereapy, and reading consultation. For some time prior to March 31, 1966, Del Monte and one or more representatives of BOCES engaged in negotiations concerning plans for the construction of a building in which BOCES could conduct its activities. This building was later to be known as the Lester B. Foreman Area Education Center ("Foreman Center"). The Foreman Center was constructed in separate "phases." On March 31, 1966, Del Monte, in his individual capacity, as landlord, and BOCES, as tenant, entered into a lease agreement concerning a building "shell," which was to comprise Phase I of the Foreman Center. This lease provided in relevant part: FIRST: The Landlord *138 has agreed to and does hereby lease and demise unto said Tenant, and said Tenant has agreed to and does hereby take from the Landlord, * * * * * *
THIRD: The term of this Lease shall be for Ten (10) years * * *. * * *
FIFTH: That throughout said term, Tenant shall keep and maintain the interior of the demised premises and all alterations, additions and improvements thereto in as good condition as at the commencement of the term, ordinary wear and tear and damages by the elements excepted * * *; and at the end of the term, to quit and surrender the demised premises with all alterations, additions and improvements, except bus ducts and removable partitions, in good order and condition * * *. * * *
THIRTEENTH: If the Tenant shall make default in the payment of the rent * * *, the Landlord may immediately * * * reenter the demised premises * * * and repossess and enjoy said premises together with all additions, alterations and improvements * * *. * * *
EIGHTEENTH: All improvements made by the Tenant to or upon the demised premises, except trade fixtures and such fixtures which can be removed without material damage to the freehold, shall when *139 made, at once be deemed to be attached to the freehold and become the property of the Landlord, except bus ducts and removable partitions, and at the end or other expiration of the term, shall be surrendered to the Landlord in as good order and condition as they were when installed, reasonable wear and damage by the elements excepted, and except as otherwise provided for herein. A Memorandum attached to the lease and signed by Del Monte provided in part: I also agree to provide and pay for all labor and materials for the erection and installation of equipment, partitions, ceilings, finished flooring, air conditioning and other items necessary to your occupancy of said building in accordance with your directions. The cost of said materials, partitions, etc., will be determined from actual invoices received by me for said materials, partitions, etc. and actual labor costs as paid by me plus a burden factor of not to exceed 17% maximum for labor. This cost arrangement is based on the assumption that the interior improvements of said building as ordered by you will not exceed $375,000.00, which price will include interest and principal, which cost is to be amortized by you and paid *140 to me over a period of five or six years, as you desire. * * * * * *
At the termination of this lease or any amendment thereof, you are to have the option to renew such lease for a period of five years at the same rental rate as paid at the termination date of such lease. As needs became apparent, BOCES and Del Monte made arrangements for the construction of building shells comprising additional phases of the Foreman Center. These agreements were incorporated into the lease as FIRST, SECOND, AND THIRD AMENDMENTS TO LEASE. Although the length of the lease was extended, the monthly rental payments (which in due course would amount to approximately $25,000 per month) adjusted, and the provisions concerning BOCES' renewal option modified under these amendments, the rights of each party as to the interior improvements were left largely unchanged. One significant modification in this regard was contained in Paragraph 5, THIRD AMENDMENT TO LEASE, which provided: In addition to any fixtures which are an integral part of the real estate, upon termination the Tenant will leave all air conditioning equipment except window air conditioners, if any, bus ducts and partitions, whether *141 fixed or moveable, as part of the premises. The THIRD AMENDMENT TO LEASE also recognized that Del Monte had conveyed the leased premises to petitioner, and that all the covenants and obligations of the lease would run between petitioner and BOCES. The building "shell" included the underlying land, walkways, and parking lots, together with such structural items as the building excavation footings, exterior walls, roof, steel framework, and floors (but not floor coverings). On October 1, 1966, Leasing, as "lessor," and BOCES, as "lessee," executed an agreement entitled "lease." Under this agreement, BOCES was obligated to make quarterly "rental" payments in the amount of $15,625. They executed another agreement on September 1, 1967, under which BOCES became obligated to make monthly "rental" payments in the amount of $7,291.67. The subject matter of these agreements was the interior improvements of Phases I and II of the Foreman Center. The terms of these agreements were seven quarters and nine months, respectively. They provided in pertinent part: 7. LOCATION - The Equipment shall be located as specified above and shall not be removed from such location without the prior *142 written consent of Lessor. Lessee will not change or remove any insignia, lettering, plates, tags or other identification * * * indicating Lessor's ownership of the Equipment. 8. MAINTENANCE - * * * Upon the expiration or termination of this lease, for any reason, Lessee shall immediately return the Equipment to Lessor in the same condition as when received * * *. 9. LOSS & DAMAGE - Lessee hereby assumes and shall bear the entire risk of loss of and damage to Equipment from any and every cause whatsoever except for the negligence or wilful act of Lessor, its agents, servants, employees or others under its control. 10. INSURANCE: LIENS; TAXES - Lessee shall provide and maintain insurance against loss, theft, damage or destruction of the equipment in an amount not less than the total rent payable hereunder, with loss payable to Lessor * * *. 11. TITLE - Title to Equipment shall at all times remain in Lessor * * *. Equipment is and shall remain personal property irrespective of its use or manner of attachment to realty * * *. * * *
17. ENTIRE AGREEMENT - No representations, warranties, promises or agreements, oral or written, express or implied, have been made *143 by either party hereto with respect to this lease or the Equipment, except as expressly provided herein. This Agreement represents the entire agreement between the parties hereto and may not be amended except in writing signed by the parties or their duly authorized representatives. On May 9, 1968, Leasing, as "lessor," and BOCES, as "lessee," executed a third agreement, under which BOCES became obligated to make 60 monthly payments, with the amount of each payment "contingent upon final costs." This agreement involved the interiors of Phase III of the Foreman Center. Unlike the earlier agreements covering the building interiors, this agreement gave BOCES the right to prepay the full amount due under the agreement without penalty. The provisions quoted above were included unchanged in this agreement. None of the agreements relating to the interiors granted BOCES any option to renew or to purchase the interiors. The "interiors" involved heating and air conditioning ductwork and equipment, fire prevention and electrical wiring equipment, wall partitions, dropped acoustical tile ceilings, floor coverings, and interior masonry walls. On July 18, 1968, Del Monte, as president *144 of petitioner, wrote the following letter to Kenneth Harris ("Harris"), superintendent of BOCES: Dear Mr. Harris: As you know, we are undertaking certain work in connection with the interiors of the Lester B. Foreman Area Education Center. This work is designated as Phases I, II and III. We are undertaking to secure financing for Phases I and II of this project but you have indicated that the Phase III work will be paid for currently by you. Accordingly, this will confirm our understanding first, that the property which is the subject of Phase III of the project constitutes personal property and shall be the property of the Board for its exclusive use in any manner which it may see fit as soon as such property is paid for by the Board. In substance we are merely acting as purchasing agent for the Board in this matter. It would be appreciated if you would acknowledge receipt of this letter by signing the copy enclosed at the indicated space and return same to us.
If your understanding is different from that stated in this letter please advise us. Very truly yours, ROCHESTER DEVELOPMENT CORP. /s/ E. J. Del Monte E. J. Del Monte President Del Monte wrote this letter *145 in response to a request by Harris that BOCES be given assurance that it would own the interiors of the building. During the period from September 21, 1966, to June 30, 1968, Leasing obtained loans totaling $850,000 to finance the construction of the Phases I and II interiors from Lincoln Rochester Trust Company ("Lincoln"). On or about June 30, 1968, Leasing sold these interiors to Development for $900,000. To finance this purchase, on September 12, 1968, Development borrowed $900,000 from Lincoln, payable in 60 equal monthly installments of $17,571.59.
On September 11, 1968, BOCES adopted resolutions to the effect that it would enter into a "lease" with Development for the Phases I and II interiors, and such a "lease" was executed on September 12, 1968. The term was five years, with a monthly "rental" of $17,571.59. A rider, also dated September 12, 1968, provided that BOCES was given the right to prepay any or all of the monthly payments, and, if it elected to prepay, it would be entitled to a credit for savings resulting from petitioner's prepayment on the Lincoln note. Petitioner granted Lincoln a security interest in all of petitioner's rights under the foregoing agreements *146 to secure the above-mentioned $900,000 note. In the security agreement, petitioner warranted that the property described and covered "is and shall be owned exclusively by [petitioner]." On July 19, 1968, petitioner and BOCES executed an "OPTION AGREEMENT" in which BOCES was given an option to purchase the "premises with improvements thereon" for $3,570,000 exercisable between July 1, 1973, and June 30, 1978. On November 5, 1968, Del Monte wrote another letter to Harris, which provided in part: A review of the documents, executed on or about September 12, 1968, for the leasing of the interiors of Phases I and II of the Lester B. Foreman Area Education Center, totaling $900,000 of equipment cost, did not indicate fully the mutual understanding between the Board and my company, with respect to the title of this equipment. Anything to the contrary notwithstanding, contained in the real property lease executed prior to this time, the expressed understanding is that upon the satisfactory discharge of the obligation of the Board, with respect to this equipment, and upon the satisfactory discharge of our obligation to the bank, this equipment, which specifically constitutes personal *147 property shall be the property of the Board for its exclusive use in any manner which it may see fit. This letter was written at the request of BOCES. During the years in question, Development, Leasing, and the E. J. Del Monte Corporation billed BOCES for the "rental" of the interior improvements. The amounts billed for the Phases I and II interiors were the fixed amounts as provided in the various agreements relating to these interiors. The amounts billed for the Phase III interiors varied greatly from quarter to quarter and were labeled as "partial rent." Some of the Phase III bills were accompanied by detailed breakdowns of the amounts charged. The amounts charged in the Phase III bills represented the costs of labor, materials, and overhead charges for the period immediately prior to the invoice date. Petitioner originally recorded the payments received for the Phases I and II interiors in its books of account as rent, but at a later date, long prior to the time the dispute involved herein arose, upon the advice of its accountants, the entries were changed to reflect the payments as receipt of interest and principal on a loan receivable. It recorded the payments received *148 for the Phase III interiors on its books of account in a "suspense" account offsetting the costs incurred. BOCES treated the interiors of Phases I, II, and III as its own property, and it made changes in the interiors without the prior approval of petitioner. Other than the interior masonry walls, which could only be removed, most of the interior improvements could be both removed and used again. On its original tax return for the year 1968, petitioner reported the payments made by BOCES with regard to the Phases I and II interiors as rental or interest income. Petitioner claimed a deduction for depreciation of these interiors on this return. On the amended tax return for the year 1968, the interest and rental income and the depreciation deduction relating to the interiors were eliminated. Petitioner did not include any portion of the payments it received from BOCES with regard to the building interiors as rental or interest income on its 1969 tax return, nor did it claim any depreciation deduction for the interiors. In his notice of deficiency, respondent determined that the interiors were leased, rather than sold, and determined that the payments relating to the interiors *149 constituted rental or interest income. Respondent further determined that petitioner was entitled to deductions for depreciation and interest expenses incurred in connection with the interiors. ULTIMATE FINDING OF FACT The agreements between petitioner (or its predecessor, Leasing) and BOCES constituted sales and not leases of the interiors in respect of Phases I, II, and III of the Foreman Center. OPINION The sole question before us is whether the transactions between petitioner (or its predecessor, Leasing) and BOCES relating to the interiors of Phases I, II, and III of the Foreman Center should be treated, for tax purposes, as sales in accordance with petitioner's contention or as leases as determined by respondent. The main thrust of respondent's contentions is that, since the parties structured the transactions in the mold of leases, petitioner should be held to that mold. In so contending, respondent relies heavily on the proposition that a taxpayer should be bound by his written agreement in the absence of "mistake, undue influence, fraud, duress, etc.," Commissioner v. Danielson,378 F. 2d 771, 775 (3d Cir. 1967), remanding 44 T.C. 549 (1965), *150 or, at the very least, strong proof that a different result from that specified in the agreement was intended, Ullman v. Commissioner,264 F. 2d 305 (2d Cir. 1959), affg. 29 T.C. 129 (1957). We think that respondent's reliance herein on Danielson and Ullman is misplaced. [1] The issue before us does not involve an attempt by petitioner to vary the undertakings set forth in the written agreements. Rather, our task is to determine the tax consequences of the agreements, keeping in mind that we are not bound by the descriptive terminology used by the parties. Strutzel v. Commissioner,60 T.C. 969, 975-976 (1973). See Simpson v. Commissioner,64 T.C. 974, 983, n. 5 (1975). The ultimate question before us is a factual one, cast in the context of the substance rather than the form of the transactions involved herein. Cf. Helvering v. Lazarus & Co.,308 U.S. 252 (1939); see Lockhart Leasing Co. v. Commissioner,54 T.C. 301, 312-313 (1970), affd. 446 F. 2d 269 (10th Cir. 1971); see also Frito-Lay, Inc. v. United States,209 F.Supp. 886, 889 (N.D. Ga. 1962); *151 Rev. Rul. 55-540, 1955-2 C.B. 39. It is to the resolution of this factual issue, resting on the ascertainment of "the intention of the parties as evidenced by the written agreements, read in light of the attending facts and circumstances" (see Haggard v. Commissioner,24 T.C. 1124, 1129 (1955), affd. per curiam 241 F. 2d 288 (9th Cir. 1956)), that we now turn our attention. Initially, we observe that respondent puts considerable emphasis on the fact that the building shells were leased and that, according to his contention, a substantial portion *152 of the interiors became affixed to and part of the real estate and therefore was owned by petitioner. From this, respondent concludes that the interiors must have been leased to BOCES. We think respondent's reasoning is deficient in several respects. In the first place, respondent is factually incorrect. The record herein reveals (and we have so found, see p. 15, supra) that all the interior improvements were removable and most of them could also be used again. In the second place, respondent fails to accord sufficient weight to the realities of the business world, where leases of land and purchase by the lessee of improvements, which become part of the real estate, frequently occur. Indeed, both the Internal Revenue Code of 1954 and the respondent's own regulations specifically recognize such situations. Section 109 (taxability to the lessor of improvements by lessee on lessor's property) [2] and section 178 (dealing with depreciation or amortization of improvements made by a lessee on the lessor's property) and the regulations thereunder. See also Meiselman v. Commissioner,300 F. 2d 666, 668 (4th Cir. 1962), revg. on other grounds T.C. Memo. 1961-90. *153 We have no doubt that both petitioner and BOCES intended a sale of the interiors. Both Kenneth Harris, superintendent of BOCES, and Del Monte testified that it was their understanding that the transactions involved were sales. The entire risk of loss in respect of the interiors was placed upon BOCES.Within a few months of the initial agreement as to Phase III and almost contemporaneously with the final agreement as to the Phases I and II interiors, petitioner wrote letters to BOCES in which it stated that it understood that, upon payment of the amount specified in the agreements, title to the interiors would pass to BOCES. These letters, written prior to the institution of these proceedings -- indeed, prior to the filing of the original tax returns for two of the three years at issue -- and, under the circumstances herein, contrary to petitioner's pecuniary interest, are highly probative of the parties' understanding of the agreements. Thus, we do not have a situation where a taxpayer, faced with the unpleasant tax consequences *154 of his agreement, seeks escape at a much later date. See Legg v. Commissioner,57 T.C. 164, 169 (1971), affd. per curiam 496 F. 2d 1179 (9th Cir. 1974). Moreover, the terms of the agreements strongly support the conclusion that there were sales. As respondent admits on brief, under the agreement covering the Phase III interiors, BOCES in fact made payments as the interiors were constructed, with payments corresponding to the work completed.Payment of the full amount due under this agreement upon installation is indicative of a sale rather than a lease.
Similarly, the payment scheme for the Phases I and II interiors supports the conclusion that the parties viewed the transaction as a sale. Monthly payments of $17,571.59 were due from BOCES for a period of 60 months. This is precisely equal to the term and monthly payments due from petitioner on the loan used to purchase these interiors from Leasing. [3]
*155 Neither of the agreements gave BOCES an option to renew the "leases" or an option to purchase the interior improvements at the expiration of the "leases," despite the inclusion of such option in the building shell leases and the amendments thereto. [4] In this respect, we note that the parties have stipulated that, if we were to determine that the transactions involved herein are leases, then petitioner will be entitled to depreciation on Phases I and II interiors based on an estimated life of 15 years and depreciation on the Phase III interior based on an estimated life of 14 years. We find it difficult to believe that BOCES, a tax-exempt organization which could obtain no tax benefit through amortization over the terms of the "leases," would expend such substantial sums to rent the interiors without obtaining renewal options, given the estimated useful lives beyond such terms. *156 Whether viewed in light of the foregoing or in light of the fact that the interiors were removable (and most of them usable again), we think it a natural inference that the payments which BOCES made were not rent, i.e., payments for the use of the interiors, but constituted something more, i.e., payments to acquire ownership thereof. Haggard v. Commissioner,supra;Bowen v. Commissioner,12 T.C. 446 (1949). Cf. section 162(a)(3). Respondent argues, in support of his position that the agreements were leases, that purchase of building interiors would be contrary to the state law governing BOCES and that BOCES would not have intended to violate the law.New York Education Law, sec. 1958.4 (McKinney 1969), provided in relevant part for the years in question as follows: The board of cooperative educational services shall have the power and duty: * * *
p. To rent suitable classrooms, offices or buildings in which to maintain and conduct such cooperative educational services and administrative offices for a period not to exceed five years and to equip and furnish such classrooms, offices or buildings in a suitable manner for such purposes *157 * * *. * * *
t. When authorized by the qualified voters of the board, to purchase or otherwise acquire buildings, sites or additions thereto, to purchase or otherwise acquire real property for any lawful purpose and to construct buildings thereon. u. To purchase necessary furniture, equipment, implements, apparatus and supplies. Respondent asserts that this provision does not authorize the purchase of a building interior by BOCES. But, as we read this provision, its scope is ambiguous at best, particularly in light of section u of the Law, and respondent has not furnished us (nor has our independent research revealed) any case law on the point. Given the unambiguous testimony of BOCES' superintendent, we refuse to infer that BOCES intended to enter into a lease because of the possibility that a sale might be unauthorized. Based on our examination of the entire record herein, including the testimony of the witnesses whom we saw and observed, we hold that the amounts received by petitioner were proceeds from the sale of the building interiors. To reflect concessions of the parties, Decision will be entered under Rule 155. Footnotes
1. We note that, since BOCES is a tax-exempt entity, competing tax considerations are not involved -- a significant element in situations where the Danielson or Ullman rule is applied. See Estate of Rogers v. Commissioner,445 F. 2d 1020, 1021 (2d Cir. 1971), affg. T.C. Memo. 1970-192; Cubic Corp. v. United States, an unreported case ( S.D. Cal. 1974, 34 AFTR 2d 74-5895, 74-2 USTC par. 9667), affd. per curiam 541 F. 2d 829 (9th Cir. 1976). See also Simpson v. Commissioner,64 T.C. 974, 983↩, n. 5 (1975).
2. All section references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue.↩
3. The record herein is such that a complete correlation is not possible between the payments by BOCES and the original costs (including interest on the money borrowed to cover such costs). But, our analysis indicates that a substantial correlation exists.↩
4. Respondent asks us to conclude that the OPTION AGREEMENT dated July 19, 1968, (see p. 13, supra↩), covered the interiors, on the ground that "it stands to reason that the difference between the cost of the shells [$1,060,138] and the option price [$3,570,000] is attributable to the interiors." We are unwilling on the basis of the record herein so to conclude; for aught that appears, the differential could be attributable to the anticipated enhancement in value between 1968 and 1973 of the land and building shells, an inference that is not without a rational basis in view of the fact that by 1973 BOCES would have paid an aggregate amount to petitioner at least equal to the petitioner's cost for the interiors. It is also significant that the option price of $3,570,000 is only approximately 11 times the annual rental for the land and building shells payable by BOCES at the point in time (1973) when the option became operative -- a not unreasonable capitalization of BOCES' obligation. Finally, we note that the OPTION AGREEMENT purports to describe the premises in a schedule annexed; in fact, the schedule was not submitted to the Court, with the result that conceivably more than the acreage involved in the leases between BOCES and petitioner was covered.