ROBERT A. SHELLEY AND BETTY B. SHELLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shelley v. Commissioner
Docket No. 5765-92
United States Tax Court
T.C. Memo 1994-432; 1994 Tax Ct. Memo LEXIS 444; 68 T.C.M. (CCH) 584; 18 Employee Benefits Cas. (BNA) 1953; August 25, 1994, Filed *444 Decision will be entered under Rule 155. For petitioners: Timothy J. Warfel. For respondent: Harris L. Bonnette, Jr.
CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax Year
Sec.
Sec.
Ended
Deficiency
6653(a)(1)
6653(a)(2)
12/31/85
$ 7,752.01
$ 387.60
[1]
12/31/86
9,167.46
--  --
12/31/87
6,787.45
--  --
Additions to Tax
Year
Sec.
Sec.
Sec.
Ended
6653(a)(1)(A) 6653(a)(1)(B) 6661
12/31/85
--  --
$ 1,938.00
12/31/86
$ 458.37
[2]
2,291.87
12/31/87
339.37
[3]
1,696.86
After concessions by the parties, the issues for decision are: [1]
(1) Whether Robert A. Shelley (petitioner) was an independent contractor or an employee during the years in issue. We hold that petitioner was an independent contractor. *445 (2) Whether petitioners have substantiated various deductions claimed on Schedules C attached to their 1985, 1986, and 1987 Federal income tax returns. We hold that they are entitled to deductions for automobile expenses, depreciation of an automobile, telephone expenses, business publications, laundry, and legal and professional services, but not for individual retirement account (IRA) custodial fees, a home office, depreciation of the home office and office furniture, entertainment expenses, travel, or promotional expenses. (3) Whether Betty B. Shelley (Mrs. Shelley) was an employee of petitioner and, if not, whether petitioners are subject to an excise tax under section 4973(a) for excess IRA contributions. We hold that she was not an employee of petitioner and that they are subject to an excise tax under section 4973(a). (4) Whether petitioners are liable for additions to tax pursuant to sections 6653(a) and 6661. We hold that they are. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. FINDINGS OF FACT Some of the facts are *446 stipulated and are so found. We incorporate by reference the stipulation of facts and attached exhibits. Petitioners are husband and wife and resided in Tallahassee, Florida, at the time they filed their petition. Petitioner is an ordained minister and the pastor of the Christian Heritage Church of Tallahassee, Florida, Inc. (the Church). Prior to joining the Church, petitioner was an ordained minister with the United Methodist Church for 30 years. The Church is a member of the International Pentecostal Holiness Church (IPHC). The headquarters of the IPHC is in Oklahoma City, Oklahoma. The book of church law of the IPHC is the International Pentecostal Holiness Church Manual (the Manual), which explains the IPHC's internal laws, structural organization, and guiding policies. The IPHC is a "connectional church" combining elements of both episcopal and congregational forms of governance. It is administered through a chain of conferences and an administrative board called the General Board of Administration. The highest conference is the General Conference, which meets every 4 years. At the next level down, the IPHC is divided into regional conferences, called quadrennial conferences, *447 which serve as the connecting link between local churches and the General Conference and the General Board of Administration. The Church is in the Sonshine Conference, which encompasses most of Florida and a portion of Georgia. The Sonshine Conference is governed by a seven-member board and a superintendent. The Church is governed by a board of Church members. The board is divided into committees, including a finance committee. Petitioner, as pastor of the Church, chaired the board and had the right to appoint and remove members. In addition, he appointed members of the board to serve on the various committees. According to the Manual, the local church board is amenable and accountable to the pastor. In order to be ordained in the IPHC, petitioner had to be "born again" and agree to adhere to the IPHC's doctrines. In addition, petitioner had to meet various educational requirements and to complete a ministerial application form. Prior to joining the IPHC, petitioner attended Emory and Henry College in Emory, Virginia, where he received a B.A. degree. He also attended Emory University, Candler School of Theology, in Atlanta, Georgia, where he received a master of theology *448 degree. He paid the cost of obtaining these degrees. Petitioner did not receive any training from the IPHC or the Church, although he was encouraged to participate in continuing education activities and did so during the years in issue. Petitioner paid part of the costs associated with the continuing education activities. Petitioner was hired by the Church in the early eighties after a pastoral committee, which was formed by the Church board to find a new pastor, found him working at a United Methodist church in Tampa. He was interviewed first by the pastoral committee. The pastoral committee then submitted his name to the Church board for approval, and ultimately to the Church congregation for approval. Finally, before he could become the pastor at the Church, he had to be approved by the Sonshine Conference board. The Sonshine Conference board does not have the power to force the appointment of a pastor to a congregation, nor can it move a pastor from one church to another at its discretion. In the IPHC, all pastors are also ministers, but not all ministers are pastors. A pastor is responsible for leading a congregation, and usually is either ordained or in the process *449 of being ordained. A minister does not need to be ordained and is accountable to the pastor of a church. During the years in issue, petitioner served as pastor of the Church and was assisted by an associate pastor. The section of the Manual delineating the duties of pastors and ministers in the IPHC states in pertinent part: B. DUTIES OF THE PASTOR 1. He is the spiritual leader of the church. a. His first concerns shall be to lead in worship, to lead in the nurture of believers, and to win the lost to Christ (looking after the spiritual welfare of the church, faithfully preaching the Word, visiting the sick, administering the ordinances of the church * * *, and promulgating the influences of the church in the community, city, or area). b. He shall endeavor to lead the laity to discover and develop the ministry gifts of the Spirit in their lives so each one can fulfill his ministries in the body of Christ. He shall further motivate and train the laity in personal soul-winning. c. He shall lead the church he pastors in extension (starting new churches) and bridging (cross-cultural) evangelism * * *.
2. He is the chairman of the local church board and the *450 ex officio chairman of all departmental boards. 3. Where a local church is incorporated, the pastor shall serve as president of the local corporation and as the executive official. 4. He is responsible for planning and presenting a program to his church designed to build it spiritually, numerically, and financially. He shall meet annually with the department heads or department boards of the local church for the purpose of setting goals for the church and developing plans to reach those goals. 5. The pastor has the privilege of authorizing the expenditure of modest sums of funds for supplies, improvements, etc. The purchase of costly equipment, property, etc., shall be with the agreement of the church board and/or church body. 6. The pastor is responsible for securing speakers for special services in the church, such as revivals, seminars, etc. When possible, he should consult with his church board and departmental boards to receive suggestions from them and to keep them informed. * * * * 8. He is to sign church reports before they are sent to the conference office. 9. He is to cooperate with the general officials and the quadrennial conference board in promoting various *451 phases of the general, quadrennial, and local church programs. 10. He shall send the names and addresses of families moving into new areas to the General Evangelism Department to be forwarded to the nearest pastor or pastors. 11. He is amenable to the quadrennial conference and the conference board. C. DUTIES OF MINISTERS 1. It shall be the duty of all ministers to participate in all phases of our church program -- general, quadrennial and local. * * * * 3. Ministers are required to attend the annual session of quadrennial conference. * * * 4. Ministers are to attend district fellowship meetings. 5. Ministers are expected to preach the Word consistent with their calling and credentials. 6. All ministers are required to report on forms provided and give full tithes monthly * * *.
Beyond these guidelines and requirements, petitioner was not required by either the Church or the Sonshine Conference to perform any specific activities or services. Neither the Sonshine Conference nor the Church board provided any supervision or evaluation of petitioner's day-to-day activities as pastor. They did not determine the hours that he worked and did not place any restrictions *452 on him with respect to hiring, supervising, or firing Church staff. Petitioner was free to delegate any of his duties to the associate pastor. In addition, he was not required to perform services only at the Church. Petitioner regularly performed evangelistic services, weddings, and funerals at locations other than the Church, and occasionally taught at colleges. Neither the Sonshine Conference nor the Church board required petitioner to account for any stipends he received for participating in these activities. As long as petitioner continued to comply with the requirements delineated in the Manual, and the local congregation remained satisfied with him, the Sonshine Conference board would not review its approval of petitioner. The Sonshine Conference relies primarily on the congregation to resolve any concerns that might arise about a pastor or minister. If that approach fails, the minister or pastor would be asked to meet with the Conference board for counseling and spiritual guidance. Ultimately, if no agreement could be reached, the minister or pastor could be placed on probation or could have his IPHC ordination certificate withdrawn. The Church board cannot fire a *453 minister or pastor directly. The Church board can, by a two-thirds vote, request that the congregation hold a vote of confidence. If less than one-half of the congregation supports the pastor or minister, he is required to leave the Church. If petitioner felt at some time that he was unhappy at the Church or that his work there was complete, he had the option of contacting a Sonshine Conference official to ask if it would be possible to move to another church within the Conference. The Sonshine Conference, however, has no duty to find another position for him or to support him financially. The IPHC does not prohibit ministers or pastors from establishing a new IPHC church. However, if a group chooses to withdraw from the IPHC to form an independent non-IPHC church, an IPHC minister may serve, at the discretion of the conference board, as pastor of that church for a period of 1 year. During this period, the minister is expected to try to bring the church back into the conference. If the church chooses not to return to the IPHC after 1 year, the minister must sever his relationship with the church or surrender his IPHC credentials. The IPHC encourages its pastors and ministers *454 to engage in mission work, and petitioner went on missions during the years in issue when he felt called to do so. Petitioner was not required to request permission to go on a mission from the Church board or the Sonshine Conference board, although he generally discussed his decision to go with the Church board. The Church normally did not pay costs relating to petitioner's missions. Petitioner frequently raised funds for missions himself and occasionally was reimbursed by people or organizations in the places that he visited. Petitioner was not asked to account for any money he received while on a mission. Petitioner was paid by the Church on a biweekly basis. His pay was determined by the Church finance committee, of which he was a member, and the Church board. Petitioner was not guaranteed a minimum salary by the Sonshine Conference. If the Church did not receive enough income in tithes to cover his full salary, petitioner would be paid less. Petitioner occasionally adjusted his salary himself so as to receive less than the amount designated. A portion of petitioner's salary was designated as a housing allowance and another portion as a book allowance. Deductions were *455 made from his compensation for petitioners' savings account, tithes to the Church, and insurance. Petitioner was entitled to continue to receive his salary for a certain number of paid vacation days each year. The Church provided petitioner with a credit card to pay for expenses he incurred while on business of the Church. The Church paid bills attributable to this credit card. During the years in issue, the Sonshine Conference offered a health insurance plan to pastors in that Conference. The Sonshine Conference paid one-third of petitioner's insurance premiums; petitioner paid the other two-thirds. If needed, petitioner would have been entitled to disability leave. The Church provided petitioner with an office, office supplies, and a secretary. Petitioner was free to hire other assistants as the need arose; their salaries were paid by the Church. Petitioner supervised the Church staff and determined the hours the staff worked. Petitioner bought books and subscribed to various publications that he used in his ministry. The Church annually reimbursed amounts in excess of $ 1,600 that petitioner spent on religious publications. In the course of petitioner's ministry, it *456 was frequently necessary for him to travel to weddings, funerals, evangelistic services, and Sonshine Conference board meetings. Petitioner used his personal automobile for this purpose. Petitioner used his home phone to speak with members of the congregation or to deal with other church-related matters. He did not have a separate telephone line for business calls. Petitioner paid the cost of having his robe and stole dry cleaned. Mrs. Shelley also was involved in the Church. She visited members of the congregation who were in the hospital or unable to leave their homes and assisted with wedding and funeral arrangements. Petitioners each contributed $ 2,000 annually to IRA's. On Schedules C of their 1985, 1986, and 1987 returns, petitioners claimed deductions totaling, $ 26,259.84, $ 32,479.78, and $ 31,312.74, respectively. Over the 3 years in issue, petitioners claimed deductions in the following categories: Bank service charges, car and truck expenses, depreciation, dues and publications, automobile insurance, laundry and cleaning, mortgage interest, legal and professional services, office expenses, automobile repairs, travel, utilities and telephone, meals and entertainment, *457 supplies, food for visitors and members, license plates, food and lodging while away from home overnight, and contract labor. Respondent disallowed all of the deductions, having determined that petitioners had failed to substantiate them, and that even if the deductions could be substantiated, petitioners were limited to claiming miscellaneous itemized business deductions on Schedules A, because petitioner was an employee of the Church, not an independent contractor. Petitioners' returns for the years in issue reflect that Mrs. Shelley received wages of $ 10,200, $ 14,800, and $ 14,800 for the years 1985, 1986, and 1987, respectively. A corresponding deduction classified as "contract labor" was claimed by petitioner on the Schedule C attached to each return. OPINION Independent Contractor or Employee
Petitioners contend that petitioner was an independent contractor and, as such, was entitled to deduct the full amount of his business expenses on Schedules C pursuant to section 162. Respondent determined that petitioner was an employee of the Church and of the IPHC during the years in issue. Petitioners bear the burden of proving that respondent's determination is not *458 correct. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Whether an individual is an employee or an independent contractor is determined after examining relevant facts and circumstances and applying common law principles. Nationwide Mut. Ins. Co. v. Darden, 503 U.S.    ,    , 112 S. Ct. 1344, 1348 (1992); Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. 225, 231 (1987), affd. 862 F.2d 751 (9th Cir. 1988). Among the factors considered in determining an employment relationship are: (1) The degree of control exercised by the principal over the details of the work; (2) which party invests in the facilities used in the work; (3) the opportunity of the individual for profit or loss; (4) whether the principal has the right to discharge the individual; (5) whether the work is part of the principal's regular business; (6) the permanency of the relationship; and (7) the relationship the parties believe they are creating. United States v. Silk, 331 U.S. 704, 716 (1947); Professional & Executive Leasing, Inc. v. Commissioner, supra at 232; *459 Simpson v. Commissioner, 64 T.C. 974, 984-985 (1975). In assessing these factors, no single fact is dispositive of the issue. Simpson v. Commissioner, supra at 985. Nevertheless, the courts have placed strong reliance on the element of control present in the relationship. Alsco Storm Windows, Inc. v. United States, 311 F.2d 341, 343 (9th Cir. 1962); Matthews v. Commissioner, 92 T.C. 351, 361 (1989), affd. 907 F.2d 1173 (D.C. Cir. 1990). In determining whether an individual is under sufficient direction and control of another to warrant the finding of an employer-employee relationship, the courts often have referred to the regulations promulgated under the employment tax provisions. Professional and Executive Leasing, Inc. V. Commissioner, supra at 231. Under section 31.3401(c)-1, Employment Tax Regs., an employer-employee relationship -- Generally * * * exists when the person for whom services are performed has the right to control and direct the individual who performs the services, *460 not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. * * * In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is not an employee.
Respondent contends that the record in this case demonstrates that during the years in issue the IPHC and the Church exercised control, or had the right to exercise control, over petitioner to such a degree that we must conclude that he was an employee. Respondent emphasizes that as a minister, petitioner qualifies as a professional who required little supervision, but that this absence of actual control should not be confused with an absence of the right to control. The threshold level of control necessary to find employee status is generally lower when applied to professional services than when applied to nonprofessional services. Azad v. United States, 388 F.2d 74, 77 (8th Cir. 1968), *461 Professional and Executive Leasing, Inc. v. Commissioner, supra at 232. However, the precise degree of control required to find an employer-employee relationship varies with different occupations. United States v. W. M. Webb, Inc., 397 U.S. 179, 193 (1970). In the instant case, even applying a lower standard of control because of petitioner's status as a professional, we find that neither the IPHC nor the Church exercised, or had the right to exercise, a sufficient degree of control to support a finding that petitioner was an employee. Petitioner was hired by the Church because of his specialized skills and his particular style of ministry. He was free to use his own methods and style in the day-to-day conduct of his activities. He was chairman of the Church board and had the power to appoint and remove members. He also appointed members of the board to the various Church committees. He was not supervised by anyone, nor was he evaluated regularly. He could hire, supervise, and fire assistants as he saw fit. He could delegate his duties to the Church's associate pastor. He had the power to adjust his own salary, *462 and did so on occasion. He performed services for the Church both on and off the Church's premises and was not restricted to performing services solely for his own congregation. He determined his own work hours. There is no evidence in the record that petitioner was subject to a mandatory retirement age. Petitioner was encouraged, but not required, to participate in continuing education. He was free to go on missions when he felt called to do so, and there was no requirement that he request permission for a leave of absence. Petitioner was not assigned to the Church by the Sonshine Conference; the Church found him itself, interviewed him, and then asked permission from the Sonshine Conference to hire him. In addition, petitioner could establish his own church within the IPHC, and could serve temporarily as pastor of a non-IPHC church. Testimony presented at trial made clear that the Sonshine Conference board will not evaluate a pastor until approached with a problem by a church that the church board and congregation have been unable to resolve. Once involved, the board's primary responsibility is to provide spiritual guidance and counseling to the pastor and the church. The *463 Manual states that if serious conflicts that cannot be resolved develop between a pastor and the quadrennial conference, the quadrennial conference has the right to place the pastor on probation or revoke his IPHC ordination certificate. However, these measures would not be used unless the pastor was unable to accomplish the basic goals for which he was hired, "to lead in worship, to lead in the nurture of believers, and to win the lost to Christ", in a manner consistent with IPHC doctrines. At no point would a quadrennial conference official step in and specifically tell the pastor how to run his church. After due consideration, we conclude that these provisions did not act as material restrictions on petitioner's freedom to use the means and methods he wished to carry out his duties as pastor. Respondent also contends that the fact that petitioner was expected to comply with the provisions of the Manual indicates that he was an employee. While the Manual imposed certain requirements on petitioner, they were more in the nature of an outline of his responsibilities than directions on the manner in which he was to perform his duties. We do not find the Manual or its contents *464 to be determinative of an employer-employee relationship. The Manual describes pastors as "amenable to the quadrennial conference and the conference board". Webster's Third New International Dictionary (1981) defines "amenable" as "1 a :liable to be brought to account or judgment :liable to the legal authority of :ANSWERABLE, ACCOUNTABLE * * * b :liable to a claim or charge * * * 2 a :capable of submission (as to a judgment or test) * * * b :readily brought to yield or submit: RESPONSIVE, TRACTABLE * * * syn see OBEDIENT, RESPONSIBLE". While this language suggests an employee-employer relationship, we are not persuaded that it fully defines the relationships between the parties. The Manual provides little guidance as to how this amenability is exercised so as to give this description significance. In addition, testimony and other evidence indicate that the relationships between the parties are more complicated than the statement suggests. A chart included in the Manual depicts the local church board as amenable or accountable to the pastor. But, similarly, an examination of the record reveals that the relationship between those parties is less hierarchical and more interwoven *465 than the chart indicates. While petitioner had a place in the structure of the IPHC, that structure was a looser affiliation than the strict hierarchy suggested by the term "amenable". After considering all the facts and circumstances affecting the issue of control, we are persuaded that petitioner was "subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result". Sec. 31.3401(c)-1(b), Employment Tax Regs. Petitioner's primary responsibility was to help the Church thrive. The record does not reflect that the Church or the Sonshine Conference retained any significant rights to control petitioner's efforts to accomplish this goal. The next factor to be considered is which party invests in the facilities used in the work. Respondent suggests that petitioner had little or no capital investment in his profession. Petitioner was not required to invest in the basic work facilities he used as a pastor. He did, however, pay for the collection of his own substantial library, which he used in his ministry, and he regularly paid a portion of the expenses associated with continuing *466 education courses and other church-related travel. We do not believe that the normal business risks of profit and loss are particularly applicable or relevant to our consideration. To the extent that this factor has any bearing, we note that petitioner had no guarantee from the Sonshine Conference or the Church that his salary would be maintained if the Church was not successful or if he left the Church and could not find another ministry within the IPHC. In this sense, petitioner did have some risk of loss. Respondent contends that the fact that there are procedures available to remove an IPHC minister from a church or to revoke a pastor's IPHC ordination certificate mandates a finding that petitioner was an employee. We disagree. Petitioner could not be fired at will by either the Church board, the Sonshine Conference, or any other body within the IPHC. Discharge of a pastor typically requires the involvement of the Church board, the congregation, and the Sonshine Conference board. According to the Manual, it is possible for the Church board to vote to request that the congregation hold a vote of confidence with respect to a pastor. However, this possibility must be considered *467 in conjunction with the fact that the pastor has the power to appoint and remove members of the Church board. As stated above, the testimony offered at trial made clear that the Sonshine Conference board will not evaluate a pastor or a minister until approached by a church with a problem that the Church board and congregation have been unable to resolve. The procedures delineated in the Manual and by witnesses for dealing with dissension within the Church are oriented more toward conflict resolution than termination, and differ from what we would expect to find in a typical employer-employee relationship. In the context of this case, we do not believe that the remote possibility that petitioner could be forced to leave the Church or could have his ordination certificate withdrawn indicates that petitioner was an employee rather than an independent contractor. We find that petitioner's work was part of both the Church's and the IPHC's regular business, and that his relationship with the Church and the IPHC was reasonably permanent. These factors may tend to suggest that petitioner was an employee; however, they are not significant enough to outweigh the conclusion we draw from *468 the record that petitioner was an independent contractor. The record does not contain a written agreement between petitioner and the Church or the Sonshine Conference that suggests the type of relationship the parties believed they were creating. Petitioner did not have any income tax withheld from his salary and did not receive any Forms W-2 from the Church, the Sonshine Conference, or any other body in the IPHC. We assume, therefore, that petitioner and the other parties involved believed that petitioner was an independent contractor. Respondent contends that petitioner received benefits that are typical of an employee-employer relationship. For example, petitioner was paid a salary every 2 weeks, and the Sonshine Conference provided a health insurance plan to ministers in that Conference. In addition, petitioner was entitled to disability leave if needed, and continued to receive his salary for a certain number of vacation days each year. While these benefits are more likely to be found in an employer-employee relationship, their presence does not eliminate the possibility that the taxpayer is an independent contractor, particularly in situations where the taxpayer maintains *469 a relationship with a particular institution over a long period of time. For example, in Butts v. Commissioner, T.C. Memo. 1993- 478, the taxpayer, who had worked for Allstate Insurance Co. for many years, was found to be an independent contractor despite the fact that he received, among other benefits: Paid vacation days, participation in a funded pension plan, matching funds for a portion of his 401(k) contributions, 75-percent contribution toward his health insurance plan, and contribution toward payment of his group-life insurance premiums. Like the taxpayer in Butts, petitioner received some benefits typical of an employer-employee relationship. Nevertheless, considering petitioner's long-term relationship with the IPHC, we find it significant that there is no evidence that petitioner received life insurance coverage or any retirement benefits through the IPHC, the Sonshine Conference, or the Church. Based on the application of the enumerated factors to the facts and circumstances present in this case, we conclude that, during the years in issue, petitioner was an independent contractor and must report his business income and expenses on *470 Schedules C. We are aware that Weber v. Commissioner, 103 T.C.     (1994), involving a United Methodist minister, shares certain similarities with the instant case but holds that the taxpayer was an employee. We find that the IPHC did not have the same type of relationship with petitioner that the United Methodist Church does with its ministers. Accordingly, we conclude that the facts and circumstances present in this case warrant our reaching a different conclusion than that reached in Weber. Deductions
Having determined that petitioner was self-employed, we address whether petitioners have substantiated amounts claimed on their Schedules C for ordinary and necessary business expenses. The amounts of the deductions claimed by petitioners on their returns bear little resemblance to the amounts in dispute at trial. Section 162 permits a taxpayer to deduct all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. However, deductions are strictly a matter of legislative grace, and petitioners bear the burden of proving that they are entitled to any deductions claimed. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934). *471 Section 6001 requires a taxpayer to keep adequate records in order to substantiate these deductions. Bank Service Charges
At trial, petitioners asserted that the bank service charges deducted on Schedule C of their return in each year were actually IRA custodial fees that should have been reported as itemized deductions on petitioners' Schedules A. Respondent agreed to allow the deductions on the Schedules A subject to petitioners' providing proof that custodial fees actually were paid in 1985, 1986, and 1987. Consequently, petitioners requested that the record be kept open so that they might provide that documentation. The Court granted petitioners' request; however, petitioners failed to provide any proof that the custodial fee was paid in each year. Accordingly, we find that petitioners are not entitled to deductions with regard to the IRA custodial fees. Automobile Expenses
For 1985, 1986, and 1987, petitioners claimed deductions of $ 1,180.53, $ 729.86, and $ 1,682.39, respectively, for the costs of repairs, maintenance, insurance, and license plates for cars allegedly used by petitioner in his trade or business. Petitioner stated that in 1985 and 1986 he maintained *472 a 1979 Mercedes solely for business use. He testified that in 1987, he traded the 1979 Mercedes for a 1982 Mercedes, which he then used solely in his trade or business. Respondent determined that petitioner presented inadequate substantiation for his automobile expenses and disallowed them in all 3 years. However, respondent determined that petitioner would qualify for the standard mileage deduction and allowed such a deduction for 1985 and 1986. Respondent used a calendar kept by petitioner in 1990 to arrive at an average yearly mileage of 14,544 miles in 1985 and 1986. For 1985 and 1986, we sustain respondent's determination with respect to this item. We believe that petitioner used a car in his ministry; however, for 1985 and 1986, the evidence presented was inconclusive as to which of petitioners' cars was used for business purposes. Consequently, petitioners cannot deduct expenses they claimed for the 1979 Mercedes, but are entitled to deduct $ 3,054.24 (14,544 miles multiplied by the standard mileage rate of 21 cents per mile) in 1985 and again in 1986. See Rev. Proc. 85-49, 1985-2 C.B. 716; Rev. Proc. 86-38, 1986-2 C.B. 701. *473 For 1987, we find that petitioners' 1982 Mercedes was used solely for business purposes and that petitioners have provided adequate substantiation to meet the requirements of section 274(d)(4). We allow petitioners a deduction of $ 1,682.39 for the costs of repairs, maintenance, insurance, and license plates. Home Office
At trial, petitioners claimed deductions of $ 1,071.84, $ 1,278.09, and $ 1,019.26, for 1985, 1986, and 1987, respectively, for home office expenses. Petitioners maintain that approximately 18 percent of their home was used for petitioner's home office. Accordingly, petitioners claimed a deduction in each year for 18 percent of the maintenance and repair expenses incurred with respect to their home. Respondent disallowed these deductions in full. Section 280A, in general, denies deductions with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence. Section 280A(c)(1) provides for the following three exceptions to the general rule: (1) A portion of the dwelling unit is used exclusively on a regular basis as the taxpayer's principal place of business; (2) a portion of the dwelling unit is used exclusively *474 on a regular basis as a place of business for meeting or dealing with patients, clients, or customers in the normal course of business; or (3) the taxpayer uses a separate structure, which is unattached to the dwelling, in connection with his trade or business. Petitioners concede that petitioner's home office was neither his principal place of business nor a separate structure unattached to the rest of the house. Rather, petitioners argue that the second exception applies. However, in order to deduct home office expenses under any of the three exceptions to section 280A, petitioners first must prove that a specific portion of their residence was used exclusively for one of the three aforementioned purposes. Hamacher v. Commissioner, 94 T.C. 348, 357 (1990). Petitioner's testimony makes clear that the office was used both as an office and as a guest room. Thus, petitioner's office fails the exclusive use test. Accordingly, we find that petitioners cannot claim deductions attributable to a home office. Depreciation
Petitioners claimed deductions for depreciation of petitioner's home office, home office equipment, and the 1982 Mercedes. *475 Petitioners argue that depreciation should be allowed as follows: 1985
1986
1987
Home office
$ 1,344.60
$ 1,195.20
$ 1,045.80
Office equipment
210.00
210.00
210.00
Automobile
-0-  -0-  2,560.00
Total  1,554.60
1,405.20
3,815.80
With respect to petitioners' 1982 Mercedes used for business purposes in 1987, we find that petitioners have presented adequate substantiation to support a deduction of $ 2,560 for depreciation. As stated above, petitioners have not met the requirements of section 280A(c) and, therefore, cannot claim deductions attributable to a home office, including depreciation. Petitioners also claimed depreciation deductions for furniture used in the home office. Petitioner presented a depreciation schedule, prepared by his accountant, that shows "Furniture & Equipment" having a total cost in 1983 of $ 1,000. Petitioner testified that he had purchased a "desk, chairs, furniture for the office, typewriter" for $ 1,000 in 1983 and that these items were used only in his business. We find that petitioners have not met their burden of proving that they are entitled to depreciation deductions for the office furniture. There is nothing *476 in the record to indicate what these items cost individually, nor what the other furniture was. Furthermore, we are not convinced that the furniture was used solely for petitioner's business activities, given petitioner's testimony that the room in which these items were kept was used both as an office and as a guest room. While it is true that property used for both business and personal purposes may be depreciated according to the percentage of trade or business usage, petitioners have not provided us with enough information to make an apportionment between business and personal use. See Stearns v. Commissioner, T.C. Memo. 1984-97. Thus, petitioners are not entitled to depreciation deductions for office furniture and equipment. Telephone
Petitioners claimed deductions of $ 1,201.21, $ 1,936.82, and $ 1,367.28 for telephone expenses related to petitioner's ministry in 1985, 1986, and 1987, respectively. Respondent disallowed these amounts in full. No deduction is allowed for a taxpayer's telephone expenses if the primary purpose of the telephone is personal rather than business. Rowell v. Commissioner, T.C. Memo. 1988-410, *477 affd. 884 F.2d 1085 (8th Cir. 1989). Petitioner presented canceled checks paid to the telephone company and testified that approximately 75 percent of all local and long distance calls received at home were related to his business. Petitioners did not maintain a separate business telephone line. Due to the nature of petitioner's business and the hours devoted to his duties, we believe petitioner's approximation of the business use of his home phone. We hold that petitioners have met their burden of proof as to the claimed telephone expenses and are entitled to the deductions claimed. Travel
At trial, petitioners claimed deductions of $ 1,341, $ 4,542.04, and $ 196.15, for 1985, 1986, and 1987, respectively, for ordinary and necessary business expenses related to trips taken by petitioner. Petitioner testified that he traveled for missions, IPHC meetings, and Sonshine Conference meetings. While some of his travel costs were covered by the Church, he paid for some expenses himself. Petitioner testified that the deductions claimed related only to his unreimbursed costs. The substantiation requirements for such expenses are statutory. Sec. 274(d). *478 In the case of travel expenses, specifically including meals and lodging while away from home, section 274(d) overrides the so-called Cohan doctrine ( Cohan v. Commissioner39 F.2d 540, 543-544 (2d Cir. 1930)), which permits us to estimate the amount of a deductible expense in some situations where a taxpayer is unable to provide adequate substantiation. Sanford v. Commissioner, 50 T.C. 823, 827 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5(a), Income Tax Regs. (for the 1985 taxable year); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985) (for the 1986 and 1987 taxable years). Section 274(d) imposes stringent substantiation requirements to which taxpayers must strictly adhere. That section specifically proscribes deductions for travel in the absence of adequate records or sufficient evidence corroborating the taxpayer's own statement. The taxpayer must substantiate: (1) The amount of each expenditure while traveling; (2) the dates of departure and return; (3) the exact localities visited; and (4) the precise *479 business purpose of each trip. Sec. 1.274-5(b)(2), Income Tax Regs. (for 1985 taxable year); sec. 1.274-5T(b)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985) (for the 1986 and 1987 taxable years). It is not enough to establish one of the elements, for example, that a particular trip was business related; rather, all of the elements must be established. Sec. 274(d). To corroborate his testimony, petitioner introduced brief summaries of an expense log either he or his secretary maintained for trips in 1985 and 1986, and some canceled checks for 1985, 1986, and 1987. Petitioner did not present the log from which the summaries were prepared. The summaries and canceled checks provide no information about the dates of travel, only general information about localities visited, and in most instances no information about the business purpose of the trip. Petitioner has failed to satisfy the substantiation requirements of section 274(d). Accordingly, we sustain respondent's determinations with respect to these travel expenses. Entertainment Expenses for Guests
Petitioners claimed a deduction for expenses incurred in entertaining guests *480 who came to visit. Petitioner testified that many of the guests were associated with the Tampa church where he previously had been the pastor. Entertainment expenses, like travel expenses, must be substantiated strictly under section 274(d). While we understand that petitioner may have wanted to maintain good relations with his former parishioners, he has not established any business purpose for the entertainment expenses, nor has he established the business relationship between himself and the guests. When asked whether the out-of-town guests were business guests, petitioner's testimony indicated that he regarded the guests as personal. We find that petitioner has failed to meet his burden of proof and sustain respondent's disallowance of these claimed deductions. Publications
For 1985, 1986, and 1987, petitioners claimed deductions for the costs of publications that petitioner used in his ministry, in the amounts of $ 1,497.73, $ 1,600, $ 1,600, respectively. Petitioner stated that he was reimbursed by the Church for amounts he spent on business publications in excess of $ 1,600. He presented canceled checks and a summary of some of the publication expenses for each *481 of the years in issue. Respondent disallowed the deductions in full, arguing that the evidence failed to establish that the purchases were related to petitioner's business. Based on petitioner's testimony and notations made on the checks, we conclude that petitioner has established that the expenses were related to his ministry and that he has substantiated the claimed deduction in each of the years in issue. Laundry and Dry Cleaning
Petitioners claimed laundry and dry cleaning costs of $ 261.96, $ 474.68, and $ 339.08, in 1985, 1986, and 1987, respectively. To support the deductions, petitioner presented canceled checks on which he had made notations. Respondent disallowed these deductions in full. Expenses of maintaining a professional wardrobe generally are nondeductible personal expenditures. Sec. 262. Expenses for clothing are deductible only if the clothing is required for the taxpayer's employment, is not suitable for general and personal wear, and is not so worn. Hynes v. Commissioner, 74 T.C. 1266 (1980). Thus, petitioner is permitted to deduct the cost of cleaning his robes and similar items. Only one check (#651) for $ 8, written *482 in 1985, bears a notation indicating that payment was for cleaning of petitioner's robe and stole. Neither petitioner's testimony, nor the notations on the other checks in evidence, are sufficient to establish that the remaining cleaning expenses claimed were not personal. Consequently, petitioners are entitled to deduct only $ 8 for laundry expenses in 1985. Legal and Professional Services
On the Schedules C attached to their 1986 and 1987 returns, petitioners claimed $ 100 and $ 150, respectively, for income tax preparation services. Respondent has conceded that petitioners are entitled to these deductions. Promotional Expenses
Petitioners did not claim any promotional expenses on their Schedules C for the years in issue, but presented evidence at trial on the substantial number of plants, flowers, and other gifts that petitioners presented to members of the congregation and the Church staff. The amounts petitioners now claim as deductible are $ 1,444.59 in 1985, $ 969.58 in 1986, and $ 2,248.70 in 1987. Respondent argues that these deductions should be disallowed as petitioners failed to prove that the gifts were ordinary and necessary expenses incurred in carrying *483 out a trade or business. Petitioner testified that the gifts stemmed from a desire to foster goodwill among his parishioners and staff; however, petitioners have not provided sufficient evidence to prove that these expenses were not personal. We find that petitioners have failed to prove that the gifts were not personal expenses; therefore, petitioners are not entitled to deductions for these amounts. Employment of Mrs. Shelley
On their income tax returns for the years in issue, petitioners included wage income Mrs. Shelley allegedly earned as an employee of her husband and deducted corresponding amounts on Schedule C in each year. The amounts purportedly paid to Mrs. Shelley were $ 10,200 in 1985, $ 14,800 in 1986, and $ 14,800 in 1987. Petitioner testified that Mrs. Shelley performed a variety of services, including visiting members of the congregation who were in the hospital or unable to leave their homes, and assisting with weddings and funerals. Petitioner explained that Mrs. Shelley did not receive a paycheck, but simply had access to the couple's joint checking account. Mrs. Shelley was not employed elsewhere during the years in issue. The inclusion of income *484 earned by Mrs. Shelley and the deduction of the same income paid by petitioner resulted in a transaction that had no income tax consequence. However, respondent alleged that petitioner's employment of Mrs. Shelley was a ruse designed to "generate" compensation for Mrs. Shelley so that contributions to her IRA would be deductible. Respondent determined that the wage income reported on petitioners' joint returns should be removed, and the deductions claimed for wages paid should not be allowed because petitioners failed to establish that an employment relationship existed between petitioner and Mrs. Shelley. Consequently, respondent determined that petitioners should not be entitled to deductions for excess contributions made to Mrs. Shelley's IRA, and that petitioners are subject to an excise tax on those excess contributions under section 4973(a). Whether petitioners are entitled to deduct IRA contributions for Mrs. Shelley depends on whether she was employed and received wages during the years in issue. Section 162 allows the deduction of "a reasonable allowance for salaries or other compensation for personal services actually rendered." Compensation is deductible only if it *485 is: (1) Reasonable in amount, (2) for services actually rendered, and (3) paid or incurred. Sec. 1.162-7(a), Income Tax Regs. When there is a family relationship, the facts require close scrutiny to determine whether there was in fact a bona fide employer-employee relationship or whether the payments were made on account of the family relationship. Martens v. Commissioner, T.C. Memo. 1990-42,affd. without published opinion 934 F.2d 319 (4th Cir. 1991). We find that petitioners have failed to substantiate that wages were actually paid to Mrs. Shelley or that a bona fide employer-employee relationship existed. Petitioner did not issue Mrs. Shelley a paycheck, nor did he document any of the services she performed. Petitioner was unable to offer any explanation for how Mrs. Shelley's salary was determined, and there was no employment contract between petitioner and Mrs. Shelley. Petitioner did not withhold income taxes from the alleged wages paid to his wife as required by section 3402(a), nor did he file employment tax returns (Forms 941). While we do not doubt that Mrs. Shelley contributed to Church activities, there *486 is little indication that this was done in the context of a employer-employee relationship. Petitioner's testimony strongly suggested that the deductibility of Mrs. Shelley's IRA contributions was one of the principal reasons he employed her. Petitioner testified that he stopped employing her when she began working at Florida A & M University (FAMU) in 1990. He did not, however, hire anyone to replace her. Similarly, there is no indication that once employed at FAMU, Mrs. Shelley stopped performing the services for the Church that she previously had performed. Petitioners have failed to establish that the alleged wages were actually paid, that any employment contract existed, or that Mrs. Shelley was treated as an employee. Therefore, we sustain respondent on this issue. Respondent determined that, as Mrs. Shelley received no wages or other compensation during the years in issue, petitioners are not entitled to an IRA contribution deduction in excess of $ 2,250 in each year. Section 219(c)(2) limits the amount that married individuals can deduct as a qualified retirement contribution. In the case of an individual who otherwise is entitled to a deduction under section 219(a), *487 who files a joint return, and whose spouse has no compensation for a given taxable year, the allowable deduction for a contribution to the spouse's IRA cannot exceed the lesser of $ 2,250 or an amount equal to the compensation includable in the individual's gross income, reduced by the deduction allowed for a contribution to the latter's IRA; but in no event may the amount allowable as a deduction for the contribution to the spouse's IRA exceed $ 2,000. Sec. 219(c). Petitioners' IRA contribution deduction of $ 4,000 in each of the years in issue exceeded their allowable maximum of $ 2,250. The balance of $ 1,750 constituted an "excess contribution" within the meaning of section 4973(b) which is subject to a 6-percent excise tax. Sec. 4973(a). Accordingly, petitioners are liable for a 6-percent excise tax for taxable years 1985, 1986, and 1987. Additions to Tax
Section 6653(a) Addition to Tax for Negligence
Respondent determined that petitioners are liable for additions to tax under section 6653(a)(1) and (2) for their 1985 taxable year and section 6653(a)(1)(A) and (B) for their 1986 and 1987 taxable years for negligence or intentional disregard of rules or regulations. *488 For 1985, section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence, and section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence. For 1986 and 1987, section 6653(a)(1)(A) imposes an addition to tax equal to 5 percent of the underpayment if any part of the underpayment is attributable to negligence, and section 6653(a)(1)(B) imposes an addition to tax equal to 50 percent of the interest payable on the portion of the underpayment attributable to negligence. Negligence is defined as the lack of due care, or the failure to do what a prudent person would do under the circumstances. Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. in part and remanding in part 43 T.C. 168 (1964); Neely v. Commissioner, 85 T.C. 934, 937 (1985). Petitioners bear the burden of establishing that the negligence addition to tax does not apply. Bixby v. Commissioner, 58 T.C. 757, 791 (1972). *489 Petitioners concede that they failed to properly report several items, including salaries and housing allowances received from the Church in each year, without satisfactory explanation. With respect to the Schedule C deductions, the record establishes that petitioners failed in several instances to prove that expenses were for business purposes and failed generally to keep adequate books and records to support the amounts claimed on the tax returns. Petitioner explained only that he was too busy to keep records. Petitioners have not demonstrated that they were not negligent with regard to the underpayments. Accordingly, we sustain respondent's determinations with respect to petitioners' liability for the additions to tax under section 6653(a). Section 6661 Substantial Understatement Addition to Tax
Section 6661(a) provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). The section 6661 addition to tax is not applicable, however, if *490 there was substantial authority for the taxpayer's treatment of the items in issue or if the relevant facts relating to the tax treatment were adequately disclosed on the returns. Sec. 6661(b)(2)(B)(i) and (ii). The record does not demonstrate that either exception under section 6661(b)(2)(B) applies. Accordingly, if recomputation of petitioners' tax liabilities reflects substantial understatements, petitioners are liable for this addition to tax. To reflect the parties' concessions and the foregoing. Decision will be entered under Rule 155. Footnotes
1. 50 percent of the interest due on $ 7,752.01. ↩
2. 50 percent of the interest due on $ 9,167.46. ↩
3. 50 percent of the interest due on $ 6,787.45. ↩
1. To resolve any confusion, we note that petitioners conceded in their reply brief that Robert A. Shelley is liable for self-employment tax pursuant to sec. 1401, as he did not make an election under sec. 1402(e)(1) to be excluded.↩